UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE)

Case No. _____

| | | |
|---|---|---|
| K.B., Individually and on Behalf of a Class of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Removed from: |
| NECA-IBEW WELFARE TRUST FUND, | ) ) | Broward County Circuit Court Case No. CACE18001182 |
| Defendant. | ) | Hon. Michael A. Robinson |

## NOTICE OF REMOVAL FROM STATE COURT

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441(a) and 1446, and U.S. District Court for the Southern District of Florida Civil Filing Requirements Section 5H, the above-captioned action, which is currently pending in the Circuit Court for the County of Broward in the State of Florida, is hereby removed by Defendant NECA-IBEW Welfare Trust Fund (the "Removing Defendant") to the United States District Court for the Southern District of Florida. As grounds for removal the Removing Defendant states as follows:

1.      On or about January 16, 2018, Plaintiff filed an action in the Circuit Court of Broward County, Florida, entitled *K.B., Individually and on Behalf of a Class of All Others Similarly Situated v. NECA-IBEW Welfare Trust Fund*, Case No. CACE18001182 (the "State Court Action").  Pursuant to 28 U.S.C. § 1446(a), a complete copy of all "process, pleadings, and orders" received by the Removing Defendant in the State Court Action is attached as **Exhibit A**.

2.      The Complaint in the State Court Action was served on Removing Defendant on January 26, 2018, although the docket in the State Court Action does not appear include an executed *Summons*, or other proof of service.

3.      Pursuant to 28 U.S.C. §1446(b), this Notice of Removal is timely because it is being filed within 30 days after the Removing Defendant's receipt of the Summons and Complaint, as well as within 20 days after the Removing Defendant's receipt of the Summons and Complaint, as required by state law. The Notice of Removal is filed with the concurrence of all Defendants in this matter.

4.      This Court is the district and division "embracing the place where [the State Court Action] is pending."  28 U.S.C. §1441(a).  The Broward County Circuit Court is located within the United States District Court for the Southern District of Florida, Fort Lauderdale Division.

## Federal Question Jurisdiction Exists

5.      This action is removable to this Court pursuant to 28 U.S.C. §1441(a) because it is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. §1331.  A party may timely remove a pending state court action to federal district court if the federal district court would have had original jurisdiction.  28 U.S.C. §1441.  Federal district courts have original jurisdiction over all civil actions arising under the Constitution, laws or treaties of the United States.  28 U.S.C. §1331.

6.      The Complaint explicitly invokes jurisdiction pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §1001, et seq.  In Count I, Plaintiff alleges, "*This count is brought under 29 U.S.C. §1132 (a)(1)(B).*" (¶ 60) (emphasis added).  Plaintiff further alleges the existence of "applicable federal law" (ERISA) regulating Defendant (¶ 61).  Count I identifies ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), as the basis of Plaintiff's claim to "injunctive relief and damages, together with attorneys' fees and costs." (¶ 65).

7.      Count II is expressly premised upon ERISA §502(a)(3)(B) and "seeks to redress… *breaches of fiduciary duties*…" (¶ 68) (emphasis added).  Count II specifically alleges Removing

Defendant is an ERISA fiduciary and breached alleged fiduciary duties. (¶¶ 69, 70, 71).  Plaintiff alleges Removing Defendant was unjustly enriched and seeks (alleged) ERISA equitable remedies of "restitution, disgorgement, surcharge and other appropriate equitable relief, together with attorneys' fees and costs."

8.      As to Count I, there is concurrent federal and State court jurisdiction over claims arising pursuant ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B).  28 U.S.C. §1441(a) "allows defendants in a state court action to remove the case to a district court having original jurisdiction of the case." Chilton v. Savannah Foods & Indus., Inc., 814 F.2d 620, 622-23 (11th Cir. 1987). The district court having original jurisdiction is the Southern District of Florida.  Count II is brought pursuant to ERISA §502(a)(3)(B), 29 U.S.C. §1132(a)(3)(B) and the District Courts have "exclusive jurisdiction over claims under §1132(a)(3)(B)." Glasser v. Amalgamated Workers Union Local 88, 806 F.2d 1539, 1541 n.3 (11th Cir. 1986) (emphasis added).   All ERISA claims in the Complaint are thus properly removed.  Because this Court has original jurisdiction under 28 U.S.C. §1331 generally and ERISA specifically, and because all other prerequisites for removal exist or have been satisfied, this action is removable under 28 U.S.C. § 1441.

9.      Having federal question jurisdiction, this Court may exercise its supplemental jurisdiction over any remaining related state law claims, including Counts III and IV.  *See* 28 U.S.C. §1367.

10.      A Notice of Filing Notice of Removal and a Copy of this Notice of Removal from State Court will be filed with the Broward County Circuit Court as required by 28 U.S.C. §1446(d). See **Exhibit B**.  Copies of same will be served upon counsel of record upon the filing of this Notice.

WHEREFORE, Defendant NECA-IBEW WELFARE TRUST FUND hereby removes the State Court Action from the Circuit Court of Broward County, State of Florida, to this Court, and

requests that the Court take jurisdiction of this civil action to the exclusion of any further proceedings in the State court.

Respectfully Submitted,

 /s/ Ivelisse Berio LeBeau
Ivelisse Berio LeBeau, Esq.
Florida Bar No. 0907693
Ivelisse@sugarmansusskind.com
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: (305) 592-2801
Facsimile: (305) 447-8115

 /s/ John P. Leahy
(pro hac vice admission pending)
John P. Leahy, Esq., No. 6229680 (IL)
johnleahy@cavanagh-ohara.com
Cavanagh & O'Hara LLP
2319 W. Jefferson St.
Springfield, IL. 62702
(217) 544-1771 (tel.)
(217) 544-9894 (fax)

 /s/ James R. Kimmey
(pro hac vice admission pending)
James R. Kimmey, No. 6314932 (IL)
jaykimmey@cavanagh-ohara.com
Cavanagh & O'Hara LLP
101 W. Vandalia St., Suite 245
Edwardsville, IL. 62025
(618) 692-5250 (tel.)
(618) 692-5254 (fax)

Attorneys for Defendant NECA-IBEW
Welfare Trust Fund

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing "Notice of Removal From State Court" was filed using the Court's CM/ECF system this 15th day of February, 2018, and further that a copy of the same was sent by email to JEggnatz@JusticeEarned.com and placed in the United States Mail, First Class Postage prepaid, for service upon:

Joshua H. Eggnatz, Esq.
Florida Bar No. 0067926
JEggnatz@JusticeEarned.com
Michael J. Pascucci, Esq.
Florida Bar No. 83397
MPascucci@JusticeEarned.com
Steven Saul, Esq.
Florida Bar No. 1002827
SSaul@JusticeEarned.com
Eggnatz Pascucci
5400 S. University Dr., Suite 417
Davie, FL  33328

                                        */s/ Ivelisse Berio LeBeau*
                                        Ivelisse Berio LeBeau, Esq.
Florida Bar No. 0907693
Ivelisse@sugarmansusskind.com
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: (305) 592-2801
Facsimile: (305) 447-8115

# EXHIBIT A

Case Number: CACE-18-001182 Division: 13

Filing # 66604602 E-Filed 01/16/2018 04:45:47 PM

CIVIL ACTION SUMMONS

## IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT, IN AND FOR BROWARD COUNTY, FLORIDA

K.B. individually and on behalf of a
class of all others similarly situated,

      Plaintiff,

v.

NECA-IBEW WELFARE
TRUST FUND

      Defendant.

_____/

## SUMMONS
## PERSONAL SERVICE ON A CORPORATION

TO DEFENDANT(S):

NECA-IBEW WELFARE TRUST FUND
ATTN: Steven L. Myers (As Registered Agent)
2120 Hubbard Avenue
Decatur, IL 62526-2871

### IMPORTANT

    A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint/petition with the Clerk of this Court, located at 201 SE 6th Street, Fort Lauderdale, FL 33301. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

    If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

Joshua H. Eggnatz, Esq. (Fla. Bar. No.: 0067926)
JEggnatz@JusticeEarned.com
Michael J. Pascucci, Esq. (Fla. Bar No.: 83397)
MPascucci@JusticeEarned.com
Steven Saul, Esq (Fla. Bar. No.: 1002827)

SSaul@JusticeEarned.com
**EGGNATZ | PASCUCCI**
5400 S. University Drive, Suite 417
Davie, FL 33328
Tel:   (954) 889-3359
Fax:   (954) 889-5913

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons and a copy of the complaint/petition in this lawsuit on the above named defendant(s).

DATED ON _____ JAN 17 2018 _____.

(SEAL)                                         CLERK OF THE ~~CIRCUIT COURT~~

BY:_____

(See reverse side)
(Vease al reves)
(Voir de l'autre cote de)

BRENDA D. FORMAN

**SEVENTEENTH CIRCUIT – BROWARD:**

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Room 470, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.

2

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene 20 Dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger.  Vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, an meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse scrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

3

Filing # 66604602 E-Filed 01/16/2018 04:45:47 PM

**IN THE CIRCUIT COURT OF THE 17ᵗʰ JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA**

K.B. individually and on behalf of a
class of all others similarly situated,

      Plaintiff,

v.

NECA-IBEW WELFARE
TRUST FUND

      Defendant.

_____/

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff K.B.[1] (hereinafter Plaintiff), individually and on behalf of a class of all others

similarly situated, files this Class Action Complaint and Demand for Jury Trial against NECA-

IBEW WELFARE TRUST FUND ("NECA-IBEW" or "Defendant"), states as follows:

**INTRODUCTION**

This case arises from Defendant's uniform unlawful conduct, which has uniformly injured

thousands of people in exactly the same way. Defendant's unlawful conduct is embodied in, and

carried out through, a fraudulent and dishonest scheme to deny paid-for health insurance coverage

benefits for acupuncture services for pain management to patients who are concurrently

undergoing behavioral health treatment. Additionally, and/or in the alternative, the putative class

includes patients who were denied paid for acupuncture benefits because they were not

simultaneously receiving acupuncture treatment in conjunction with a formal physical therapy

program.

---

1.     The Plaintiff, an insured of Defendant, and patient of Mibaso S Corp, is referred to as K.B. throughout this Complaint to protect the privacy and confidentiality of the patient in this public filing, and to otherwise protect against the public disclosure of sensitive HIPPA protected and other personally identifiable information. Plaintiff's full name and other identifiable information will be provided to Defendant upon entry of appearance in this action.

### NATURE OF THE ACTION

1.     All medical professionals, and all who work with them, including health insurers, learn that the first rule of medicine is to "do no harm." This case arises not merely from Defendant's callous indifference to doing harm, but from its deliberate choice to do harm, in order to maximize profits by avoiding costs. Defendant has intentionally chosen to deny the paid for benefits of Plaintiff and the class in the interest of profits.

2.     Defendant NECA-IBEW markets, sells, and administers health insurance contracts (the "Policies") to thousands of people in Florida and across the nation (the "Insureds"), who have the right to rely on Defendant to handle their health insurance claims with the utmost good faith.

3.     Defendant, acting in concert with others, is engaged in an unlawful pattern and practice of using inherently fraudulent, pretextual cost-avoidance criteria to deny coverage for acupuncture benefits that were contracted for and promised to Plaintiff and the class as policy holders. Defendant's wrongful conduct has caused serious harm, and threatens to cause more harm, to Plaintiff and the Class.

4.     Chronic Pain is a debilitating, degenerative disease that causes physical pain, psychological pain and leads to depression.[2] The National Institute of health estimates that 11% of the population (25 million people) suffers from chronic pain.[3] Many Americans turn to powerful painkillers like opioids and steroids to manage their pain, but those treatments merely mask the pain, and often lead to detrimental drug addictions. For those patients who do not want to jeopardize becoming a drug addict, acupuncture is a popular, non-invasive treatment that helps treat chronic pain.

---

2.     http://www.mayoclinic.org/diseases-conditions/depression/expert-answers/pain-and-depression/faq-20057823 (last visited January 16, 2018).

3.     https://www.washingtonpost.com/news/to-your-health/wp/2015/08/11/nih-more-than-1-in-10-american-adults-experience-chronic-pain/?utm_term=.dce8ad5fb949 (last visited January 16, 2018).

5.      In Policy and Policy-related disclosures to Plaintiffs and Class Members that are uniform in all material respects, Defendant consistently, expressly, and uniformly represented that coverage and treatment decisions under the Policies are made on the basis of "medical necessity."[4] As a matter of law and logic, a drug-free, non-invasive treatment, that is listed in the Plaintiff's Policy as a covered expense and is commonly prescribed by Medical Doctors, is medically necessary. But contrary to Defendant's express representations, and in furtherance of a common, unlawful scheme, Defendant, is and has been systematically and continuously breaching its promises, by intentionally misrepresenting and failing to disclose that it will not provide this medically necessary coverage if the patient: a) is concurrently seeking behavior health treatment; or b) not simultaneously participating in a formal physical therapy program. Despite NECA-IBEW agreeing to provide K.B. 48 acupuncture visits per year, it wrongfully denied the contracted for benefits based on non-existent and made up exclusions.

6.      To carry out and conceal its unlawful scheme, Defendant attempted to conjure up erroneous medical explanations to justify its wrongful denial of acupuncture benefits.  Defendant has taken the odd and untenable position that otherwise covered acupuncture benefits are not covered if the patient is concurrently undergoing behavioral health treatment. Defendant further claims that acupuncture is only appropriate and medically necessary when administered in conjunction with a formal physical therapy program.[5] However, nowhere in Defendant's advertisements, Policy, or Summary Plan Description of acupuncture benefits, does Defendant disclose that acupuncture is not covered under these circumstances.  Defendant is not permitted to re-write its Policy language "after-the-fact" to gain an unjust profit.

---

4.      *See* Summary Plan Description, attached and incorporated hereto as **"Exhibit A."**

5.      Id.

7.      Further, Defendant expressly provided pre-authorization over the phone to Mibaso S Corp ("Mibaso"), Plaintiff's acupuncture provider, and advised that acupuncture was covered under Plaintiff's Policy for the treatment of chronic pain. Therefore, Defendant is now estopped from denying these benefits after-the-fact, as Mibaso and K.B. have detrimentally relied on Defendant's pre-authorization and have now suffered harm.

8.      Acupuncture is medically necessary by any objective definition (including the definition in the Policy), and Defendant must provide the coverage it promised to provide, or pay the retail costs of obtaining it, together with such other relief as is necessitated by its wrongful conduct. Plaintiffs and Class Members have suffered long enough.

## I.      JURISDICTION AND VENUE

9.      Jurisdiction exists pursuant to *Florida Statute* § 48.193(1)(a)(1), because Defendant operates, conducts, engages in, and carries on its business in this state.

10.     Venue exists pursuant to *Florida Statutes* §§ 47.011, 47.041, and 47.051, because Plaintiff's causes of action accrued in this County.  Defendant conducts business in Broward County, Florida, and the events, acts, misrepresentations, and/or omissions giving rise to Plaintiff's causes of action occurred in this County.

## II.      PARTIES

11.     Plaintiff, K.B., is a resident of Broward County, Florida. Mibaso is a Florida corporation with its principle place of business in Broward County, Florida. Mibaso rendered acupuncture services to K.B. in Broward County, Florida. K.B. provided Mibaso written authorization to act on behalf of K.B., and NECA-IBEW accepted and otherwise acknowledged Mibaso as a representative and third-party beneficiary to act and collect health insurance benefits on behalf of K.B. in Broward County.

12.     Defendant, NECA-IBEW is an Illinois corporation with its principle place of business listed as 2120 Hubbard Avenue, Decatur, IL 62526, and is therefore a "citizen' of the state of Illinois. Defendant lists a registered agent as Steven L. Myers, located at 2120 Hubbard Avenue, Decatur, IL 62526-2871. Defendant also owns and maintains a website, *https://www.neca-ibew.org/Welfare-Trust-Fund/*, which lists the Plaintiff's insurance policy providing coverage for Acupuncture services.

13.     Defendant and its employees, subsidiaries, affiliates, and other related entities, were, at all times relevant herein, agents, servants and employees of each other, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Whenever reference in this Complaint is made to any act or transaction of Defendant, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Defendant committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Defendant, while actively engaged in the scope of their duties.

### III.    FACTUAL ALLEGATIONS

**A. The Contract of Insurance that Defendant sold to K.B.**

14.     K.B. is covered by the employee-sponsored health insurance policy issued by Defendant. The Policy promises coverage for medically necessary care in exchange for the payment of premiums. In exchange for the benefits promised by the Policy, K.B. pays and paid a monthly premium.

15.     The Policy defines medically necessary care to be a service or supply that is:

- Provided by or under the direction of a physician or other duly licensed health care practitioner who is authorized to provide and prescribe it;

- Necessary in terms of generally accepted American medical standards;

- Consistent with the symptoms or diagnosis and treatment of a Sickness or Injury;

- Not provided solely for the convenience of the patient, physician, hospital, health care provider or facility;

- Appropriate, as defined by the Plan, given the patient's circumstances and conditions;

- Cost-efficient, as defined by the Plan, for the supply or level of service that can be safely provided to the patient; and

- Safe and effective for the Sickness or Injury for which it is used.

16.    Acupuncture is a covered treatment under K.B.'s Policy and by any lawful standard of objective reasonableness, acupuncture is generally accepted as medically necessary and appropriate for the treatment of chronic pain. In fact, the plain language of the Policy itself acknowledges the medical necessity and appropriateness of acupuncture, subject to a 48-visit limit. Accordingly, K.B. was and is entitled to coverage for the acupuncture services rendered by Mibaso.

17.    The Policy that Defendant sold to Class Members were uniform and standardized in all material respects that are relevant to Plaintiff's and Class Members' claims.

18.    All Policies that Defendant sold to Class Members contained substantially similar definitions of "medical necessity," or contained definitions with immaterial differences. All Policies sold to Class Members promised to cover the cost of acupuncture treatment where such treatment satisfied the "medical necessity" definition set forth above, or the materially identical definitions in the other Policies.

19.    Plaintiff and Class Members reasonably relied on Defendant's express and implied representations that they would be covered for medically-necessary services.

**B.  KB and Class Members are Diagnosed with Chronic Pain**

20.      K.B. and Class Members were all prescribed acupuncture therapy for the purpose of pain management. Medical providers prescribed acupuncture as a viable, non-drug related, non-invasive, treatment to treat chronic pain.

**C.  Acupuncture is a Common Treatment for Patients with Chronic Pain**

21.      Plaintiff's licensed and qualified Medical Doctor prescribed acupuncture as a treatment for K.B.'s chronic pain, as an alternative to powerful and addictive pain medication. Over prescribing of pain medication has led to the opioid crises plaguing nearly every community in our nation.   Acupuncture comes is prescribed as a logical alternative to addictive drugs and surgery for treatment of chronic pain

22.      Acupuncture has long been recognized as an effective treatment for chronic pain. In 2012, as study found acupuncture was "better than no acupuncture or simulated acupuncture for the treatment of four chronic pain conditions: (1) Back and Neck pain, (2) Osteoarthritis, (3) Chronic Headache, and (4) Shoulder Pain.[6]

23.      Surveys have indicated that nearly 3.5 Million people annually used acupuncture to deal with chronic pain.[7]

24.      Clearly Acupuncture is a reasonable treatment for Plaintiff and Class Members who do not desire the risks of surgery and powerful drugs.

**D.  Defendant Denies Plaintiff and Class Members Coverage for Acupuncture Coverage**

25.      K.B. was prescribed acupuncture by his licensed Medical Doctor to treat his chronic pain. Defendant does not deny that K.B. suffers from chronic pain.

_____

6.      http://www.webmd.com/pain-management/features/acupuncture-pain-killer#1

7.      Id.

26.     In May 2016, Mibaso's billing agent confirmed over the telephone that the prescribed and to-be rendered acupuncture services were covered benefits under K.B.'s Policy. The Defendant assured Mibaso's billing agent that acupuncture was covered.

27.     Additionally, it explicitly states in the NECA-IBEW Welfare Trust Fund "Summary Description Plan" that "Acupuncture subject to a 48-visit limit," is a "Covered Medical Expense." [8]

28.     In reliance upon Defendant's representations and Policy language, Mibaso provided covered acupuncture services to K.B in the amount of $12,600.00, which is due and owed.

29.     Despite providing the Defendant with all the required documentation, Defendant refused to pay Mibaso as contractually required by KB's plan.

30.     Defendant's initial explanation for the denial of payment was that K.B. was being treated for alcoholism. However, Mibaso did not treat K.B. for alcoholism or submit bills to Defendant for alcoholism related treatment. Mibaso only treated K.B. and subsequently submitted bills for reimbursement only for treatment of K.B.'s chronic pain.

31.     Plaintiff and Mibaso appealed the Defendant's initial denial of benefits, explaining that Defendant was mistaken about the nature of K.B.'s treatment, and that no bills were submitted for the treatment alcoholism. Rather, all the billing was for the treatment of chronic pain. Defendant, realizing its mistake, again denied the appeal, but this time changed the basis for its denial claiming that the acupuncture treatment was not covered because K.B. was: a) concurrently seeking behavior health treatment, and b) not simultaneously participating in a formal physical therapy program.

---

8.     NECA-IBW Welfare Trust Fund 2013 Summary Plan Description, *Covered Medical Expenses 39, available* at https://www.neca-ibew.org/Welfare-Trust-Fund/

32.     K.B. has satisfied all conditions precedent to be entitled to the benefits of K.B.'s

Policy. K.B. and Mibaso have exhausted their appeal rights under the Policy with continued

adverse determination. Aa result, Defendant is in Breach of Contract and in Violation of ERISA

for not providing the contractually owed benefits. The Policy specifically authorizes Plaintiff to

initiate civil action in state court since his claim for benefits have been denied.

## ERISA ALLEGATIONS

33.     ERISA requires that all employee benefit plans establish and maintain reasonable

claims procedures. Specifically, 29 C.F.R. section 2560.503- 1(b)(5) requires that "[t]he claims

procedures contain administrative processes and safeguards designed to ensure and to verify that

benefit claim determinations are made in accordance with governing plan documents and that,

where appropriate, the plan provisions have been applied consistently with respect to similarly

situated claimants." 29 C.F.R. § 2560.503l(b)(5).

34.     Moreover, ERISA only allows claims administrators to rely on internal rules or

policies in construing the terms of an employee benefits plan if those rules or policies reasonably

interpret the applicable plan.

35.     By issuing coverage guidelines and making coverage determinations on behalf of

ERISA-governed insurance plans, Defendant has acted, and is acting, as a plan administrator and

its actions give rise to a fiduciary duty on behalf of the ERISA governed plans that it administers.

As a fiduciary, Defendant is legally required to discharge its duties "solely in the interests of the

participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants

and their beneficiaries and paying reasonable expenses of administering the plan.

36.     Defendant has an inherent conflict of interest in its administrative role because

every claim it denies increases its profits

37.     Defendant, as a plan administrator with discretionary authority to determine

whether claimants are entitled to benefits under the insurance plan, has systematically disregarded

the medically necessary acupuncture treatment of K.B. and Class Members', and used internal self-serving after-the-fact clinical guidelines that are inconsistent with the plain language of subject Policy and prevailing medical standards.

38.     Defendant's first excuse for denying K.B.'s benefits was that K.B. was being treated for Alcoholism. However, no acupuncture was billed for Alcoholism and in fact all billing submitted was specifically for the treatment of K.B.'s documented chronic pain. When Plaintiff appealed the denial of the claim and advised Defendant that its reason for denial was factually inaccurate, Defendant backtracked and provided a different, but nonetheless erroneous, excuse for their denial.

39.     Defendant's second excuse involved a two-part explanation. First, Defendant claims that acupuncture was not medically necessary because K.B. was receiving acupuncture therapy while concurrently in a substance abuse treatment facility. Defendant's position that a patient is prohibited from receiving acupuncture therapy for pain management because they are also receiving behavioral health treatment, without any explanation, is in bad faith, illogical, defies reason, flies in the fact of public policy, and is in clear contractual breach of the plain Policy language.

40.     Second, Defendant claims that acupuncture is only "medical necessity" if it is prescribed in conjunction with a formal physical therapy preprogram.   Defendant's invention of non- existent exclusions is not a reasonable claim procedure. Defendant cannot escape its contractual obligation to reap an unfair profit. This practice is wholly inconsistent with the terms of K.B. and Class Members' policies, and contravenes 29 C.F.R. section 2560.503- l(b)(5). Defendant's employment of fraudulent explanations is flatly inconsistent with the "'broadly protective' purposes of ERISA" and would allow Defendant free reign to fabricate an explanation every time they feel the need to deprive a policy holder of their entitled benefits.

## CLASS ALLEGATIONS

### A. Class Definition

41.     Plaintiff brings this class action individually, and on behalf of a putative class of similarly situated purchasers of the Products, and pursuant to *Florida Rules of Civil Procedure* 1.220(b)(1) and/or 1.220(b)(2), and in the alternative, 1.220(b)(3), seeks class certification of the claims and issues pleaded in this Complaint, on behalf of the Class defined as follows:

> All participants or beneficiaries of an insurance plan governed by ERISA, for which NECA-IBEW Welfare Trust Fund, its affiliates, subsidiaries, agents, or entities, have, or have been delegated, the authority to make coverage decisions with respect to claims for Acupuncture treatment, who were denied coverage and/or payment for acupuncture treatment by Defendant because: (1) the participant or beneficiary was concurrently undergoing behavioral health treatment; or (2)  the participant or beneficiary was  not receiving acupuncture in conjunction with a formal physical therapy program.

42.     Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

43.     Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether class certification is appropriate.

**Numerosity**

44.     The individual Class Members are so numerous that their individual joinder is impracticable. Defendant sells many thousands of health insurance policies in the state of Florida and throughout the country and, as a general business practice, has failed to comply with applicable law. Moreover, individual Class Members easily can be identified from Defendant's business

records, because Defendant knows (a) who the Insureds are, (b) which plans they are insured under, (c) what types of claims they have filed, and (d) how those claims were adjudicated.

45.     On information and belief, the number of Class Members is in the thousands. The precise number will be determined through discovery, but they are too numerous to be consolidated in one complaint, and it is impractical for each to bring an individual action.

**Commonality**

46.     There are questions of law and fact that are common to Plaintiff's and Class Members' claims.

47.     Common questions of law and fact include, but are not limited to, the following:

   (a)   Whether Defendant is categorically denying coverage for acupuncture treatment to Class Members who concurrently receiving behavior health treatment;

   (b)   Whether Defendant is categorically denying coverage for acupuncture treatment to Class Members because they are not undergoing a formal physical therapy program;

   (c)   Whether Defendant is acting and/or refusing to act on grounds generally applicable to Plaintiff and Class Members;

   (d)   Whether Defendant's pattern and practice of denying coverage for acupuncture treatment for Plaintiff and Class Members constitutes a wrongful denial of plan benefits under ERISA;

   (e)   Whether Defendant has breached its fiduciary duties under ERISA in the administration of Plaintiff's and Class Members' claims for plan benefits;

   (f)   Whether creation of inherently deceptive and fraudulent coverage guidelines in service of a cost-avoidance scheme constitutes a breach of fiduciary duty;

(g)   Whether Defendant's misrepresentations as to medical necessity and its failure to disclose a cost-avoidance scheme intended to disregard the Policies' definition of medical necessity, and other practices described above, violated Defendant's fiduciary duties to refrain from misrepresentations and make truthful disclosures to Plaintiff and Class Members;

(h)   Whether Defendant is liable to Plaintiffs and Class Members for damages and injunctive relief from its ERISA violations;

48.   The above-identified common questions predominate over questions, if any, that might affect only individual Class Members.

49.   Defendant has subjected (and is subjecting) Plaintiff and Class Members to the same harm in the same manner. The conduct described above constitutes Defendant's standard business practice.

**Typicality**

50.   Defendant's own records demonstrate that Plaintiffs are members of the Class. Plaintiff's claims are typical of the claims of Class Members because they are based on the same legal theories, arise from the similarity, uniformity, and common purpose of Defendant's unlawful conduct, and are not subject to any unique defenses. Members of the Class have sustained, and will continue to sustain, damages in the same manner as Plaintiff's as a result of Defendant's wrongful conduct.

51.   Moreover, as to the Class Members, Defendant issued and administered Policies in which it made promises materially identical to those it made to K.B. — to cover medically necessary treatment—and engaged in materially identical conduct in wrongfully denying those claims. Thus, the promises, practices, and decisions that Defendant made with respect to K.B.'s

claim for acupuncture coverage is materially the same as those it made with regard to the Class Members' claims for acupuncture coverage.

**Adequacy of Representation**

52.     Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of its Members. Plaintiff is committed to the vigorous prosecution of this action, and has retained competent counsel who are experienced in litigation of this nature to represent him. There are no conflicts or antagonism between the interests of Plaintiff and unnamed Class Members.

53.     To prosecute their case, Plaintiff has chosen the law firm of Eggnatz & Pascucci LLP, and is obligated to pay a fee for that representation. This firm is experienced in class action litigation and possesses the financial and legal resources to deal with the costs and legal issues inherent in this action.

**Requirements of *Florida Rule of Civil Procedure* 1.220(b)(3)**

54.     Questions of law or fact common to Plaintiff's and Class Members' claims predominate over any questions of law or fact affecting only individual Class Members. All claims by Plaintiff and Class Members arise from Defendant's common course of unlawful conduct, in breach of the Policies and violation of ERISA. The predominating questions of law and fact include those set forth above in Paragraph 33.

55.     Common issues predominate where, as here, liability can be determined on a class-wide basis, even if there might be the need for some individualized damages determinations. As a result, in determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

**Superiority**

56.     A class action is superior to individual actions, in part because of the following, non-exhaustive list of factors:

   a.  Individual joinder of all Class Members would impose extreme hardship and inconvenience on them, because they reside all across the nation;

   b.  Individual claims by Class Members are impractical because the cost of pursuing an individual claim could exceed its value. As a result, individual Class Members have no interest in prosecuting and controlling separate actions;

   c.  There are no known Class Members who are interested in individually controlling the prosecution of separate actions;

   d.  The interests of justice will be served by resolving the common disputes of all Class Members in one forum;

   e.  Judicial and party resources will be conserved by resolving the common disputes of all Class Members in one forum;

   f.  Individual claims would not be cost effective or economically feasible to pursue through individual actions;

   g.  The action is manageable as a class action.

**H.  Requirements of *Florida Rule of Civil Procedure* 1.220(b)(2)**

57.     The prosecution of separate actions by (or against) individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant and any other party opposing the Class.

58.     Defendant has acted or failed to act in a manner generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to all Class Members.

## COUNT I
### Claim for Improper Denial of Benefits

59.     Plaintiff and the Class Members re-allege paragraphs 1 through 58, as if fully set forth here.

60.     This count is brought under 29 U.S.C. § 1132(a)(1)(B).

61.      Plaintiff and Class Members are covered by insurance plans issued by Defendant. Under the terms and conditions of the insurance plans and applicable federal law, Defendant is required to cover and approve payment for treatment that is medically necessary. Such treatment indisputably includes treatment for acupuncture—a standard treatment used in healing chronic pain—which is medically necessary under any standard of objective reasonableness.

62.     Defendant is the entity responsible for administering and making benefit determinations under Plaintiff's and Class Members' health insurance plans, and for developing internal practices and policies that are applied to such determinations. Specifically, Defendant, among other things, exercises discretionary authority or control over the management of the plans, exercises authority or control over management or disposition of the plans' assets, and has the authority to make decisions (and does make decisions) regarding claims for benefits and appeals thereof, including approving payment and writing checks for coverage.

63.     Defendant has abused its discretion and wrongfully denied claims submitted by Plaintiff and Class Members, in furtherance of an unlawful cost-avoidance scheme that employed policies and practices that are inconsistent with the relevant terms of K.B.'s and Class Members' health insurance plans and ERISA.

64.     Defendant's improper denials have caused damage to Plaintiff and Class Members in the form of uncovered and unreimbursed claims for acupuncture treatment.

65.     Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff KB and Class Members have a right to injunctive relief and damages, together with attorneys' fees and costs.

**WHEREFORE**, Plaintiff, individually and on behalf of the putative Class, seeks actual damages, injunctive relief, equitable relief including declaratory relief, restitution, pre-and post-judgment interest, reimbursement of costs, attorneys' fees, and for any other relief that this Court deems just, appropriate, and proper

## COUNT II
### Claim for Other Appropriate Equitable Relief

66.     Plaintiff and the Class Members re-allege paragraphs 1 through 58, as if fully set forth here.

67.     This Count is brought under 29 U.S.C. § 1132(a)(3)(B), and is separate and distinct from the relief sought under Count I.

68.     Specifically, this Count seeks to redress Defendant's breaches of fiduciary duties through its across-the-board, mechanical application of pretextual, inherently fraudulent coverage guidelines to elevate profits over the needs of plan Insureds. Relief under Count I will not make Plaintiff and the Class Members whole.

69.     As the entity responsible for making benefit determinations under K.B.'s and Class Members' health insurance plans, and for developing internal practices and policies applied in making such determinations, Defendant is an ERISA fiduciary within the meaning of 29 U.S.C. §§ 1109(a) and 1002(21)(A). Specifically, Defendant, among other things, exercises discretionary authority or control over the management of the plans, exercises authority or control over management or disposition of the plans' assets, and has the authority to make decisions (and does

make decisions) regarding claims for benefits and appeals thereof, including approving payment and writing checks for coverage.

70.     As an ERISA fiduciary, Defendant owed K.B. and Class Members numerous fiduciary duties, including the duty to make decisions in accordance with plan terms and ERISA requirements.

71.     Notwithstanding its fiduciary obligations, Defendant developed and relied on an inherently fraudulent cost-avoidance scheme and pre-authorization "guidelines" that improperly restricted acupuncture coverage in contravention of Plaintiff and Class Members' health insurance plan terms and ERISA requirements. In doing so, Defendant violated its fiduciary obligations. Plaintiff and Class Members have been harmed by Defendant's breaches of fiduciary duty, because their claims have been subjected to inherently fraudulent and unlawful restrictions that are not part of the health insurance plans at issue, which violates ERISA.

72.     Additionally, by engaging in this misconduct, Defendant has been unjustly enriched insofar as it has reaped (and kept) millions of dollars in premiums that it never honored by providing contractually-promised coverage for medically-necessary treatment.

73.     Pursuant to 29 U.S.C. § 1132(a)(3)(B), Plaintiff KB and the Class Members have a right to restitution, disgorgement, surcharge and other appropriate equitable relief, together with attorneys' fees and costs.

**WHEREFORE**, Plaintiff, individually and on behalf of the putative Class, seeks actual damages, injunctive relief, equitable relief including declaratory relief, restitution, pre and post judgment interest, reimbursement of costs, attorneys' fees, and for any other relief that this Court deems just, appropriate, and proper.

## COUNT III
### Breach of Contract

73.     Plaintiff and the Class Members re-allege paragraphs 1 through 58, as if fully set forth here.

74.     K.B. and other Class Members entered into a contract with Defendant to provide health care services.

75.     Plaintiff and other members of the class, were the intended beneficiaries of such contract.

76.     K.B. agreed to the terms and conditions to the contract and performed his end of the bargain by timely paying his premiums.

77.     Similarly, at various times during the class period, numerous other class members entered into health care services contract with Defendant which by their terms are to provide almost identical services in an almost identical cost scheme.

78.     Similarly, all of the other class members agreed to the terms and conditions to their contracts and performed their end of the bargain by timely paying their premiums.

79.     Defendant failed to satisfy its obligations under the contract in that it failed to provide coverage or reimbursement for payment for covered acupuncture services.

80.     As a result, Defendant has breached its contract with Plaintiff and Class Members, and has been damaged in an amount equal to the unreimbursed but otherwise covered acupuncture services, the actual costs paid by beneficiaries or participants for covered acupuncture services, and/or market value for acupuncture services that should have otherwise been covered.

81.     In addition, Defendants should be ordered to perform its contractual obligations going forward.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, seeks actual damages, injunctive relief, equitable relief including declaratory relief, restitution, pre and post

judgment interest, reimbursement of costs, attorneys' fees, and for any other relief that this Court deems just, appropriate, and proper. .

### COUNT IV
### Unjust Enrichment

82.     Plaintiff and the Class Members re-allege paragraphs 1 through 58, as if fully set forth here.

83.     K.B. and the other members of the proposed Class conferred a benefit on Defendant by purchasing insurance and paying premiums.

84.     Defendant has further benefited monetarily from the improper conduct by failing to provide the full benefit of benefits to which K.B. and the other members of the class are entitled thus reducing its cost.

85.     Defendant benefit came at the expense and detriment of Plaintiff and the other Class members.

86.     Defendant has thus unjustly enriched itself in retaining the premiums derived from the deceptive insurance contracts.

87.     Plaintiff and the other Class Members were injured as a direct and proximate result of Defendant deceptive and unfair activities.

88.     Because Defendant's retention of the non-gratuitous benefit conferred on it by K.B. and the Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff's assignor and the other members of the proposed class for its unjust enrichment, as ordered by the Court.

89.     Equity and good conscience require that Defendant to disgorge its profits made thereby, and Plaintiff and the other members of the class further seek restitution on this basis.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, seeks actual damages, injunctive relief, equitable relief including declaratory relief, restitution, pre and post judgment interest, reimbursement of costs, attorneys' fees, and for any other relief that this Court deems just, appropriate, and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on its own behalf and on behalf of all similarly situated Class Members (as defined above), demand judgment against Defendant as follows:

a.   For an order certifying the proposed class, appointing Plaintiff and its counsel to represent the proposed class and notice to the proposed classes to be paid by Defendants;

b.   Declaring that Defendant's cost-avoidance scheme and fraudulent coverage guidelines are contrary to, and violate, the terms of ERISA;

c.   For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint

d.   Ordering Defendant to recalculate and issue unpaid benefits to Plaintiff and Class Members, whose claims were denied as a result of Defendant's unlawful conduct;

e.   For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

f.   Awarding other appropriate relief to Plaintiff and Class Members (under 29 U.S.C. § 1132(a)(3)), including (a) enjoining Defendant from using hidden criteria to deny coverage of medically-necessary acupuncture treatment in furtherance of an unlawful cost avoidance scheme, (b) restitution of premiums, (c) disgorgement of profits, and (c) a surcharge remedy.

g.   Awarding Plaintiff and Class Members their costs and disbursements, and reasonable allowances for fees and reimbursement of expenses, including reasonable attorney and expert fees. pursuant to 29 U.S.C. § 1132(g), in amounts to be determined by the Court;

h.   For damages suffered by Plaintiff and the other members of the proposed class;

i.   For Plaintiff's reasonable attorneys' fees and costs incurred, as permitted by law;

j.   For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

k.      For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

DATED: 1/16/2018                    **Respectfully Submitted,**

By:     */s/ Joshua H. Eggnatz*
Joshua H. Eggnatz, Esq. (Fla. Bar. No.: 0067926)
*JEggnatz@JusticeEarned.com*
Michael J. Pascucci, Esq. (Fla. Bar No.: 83397)
*MPascucci@JusticeEarned.com*
Steven Saul (Fla. Bar. No.: 1002827)
*SSaul@JusticeEarned.com*
**EGGNATZ | PASCUCCI**
5400 S. University Drive, Suite 417
Davie, FL 33328
Tel:     (954) 889-3359
Fax:    (954) 889-5913

# EXHIBIT A

## BASE PLAN

# NECA-IBEW
# Welfare Trust Fund



SUMMARY PLAN DESCRIPTION

FOR ACTIVE PARTICIPANTS AND DEPENDENTS

## 2013 Edition

**NECA-IBEW Welfare Trust Fund**
2120 Hubbard Avenue
Decatur, IL 62526-2871
800-765-4239
www.neca-ibew.org

**Fund Administrator**
Steven L. Myers

**Legal Counsel**
Cavanagh & O'Hara

**Fund Auditor**
Kerber, Eck & Braeckel, LLP

**Fund Consultant**
The Segal Company

**Agent for Legal Process**
Steven L. Myers
IBEW-NECA Benefits Administration Association
2120 Hubbard Avenue
Decatur, IL 62526-2871

---

## Statement of Grandfathered Status

The Trustees believe that this Plan is a "grandfathered health plan" under the Affordable Care Act, which permits us to preserve certain basic health coverage already in effect before the law was passed. As with all grandfathered health plans, our Plan does not have to include certain consumer protections of the Affordable Care Act that apply to other plans (for example, providing preventive health services without any cost sharing). However, grandfathered health plans, like our Plan, must comply with other consumer protections in the Affordable Care Act (for example, the extension of coverage for dependent children to age 26).

Contact the Welfare Trust Fund Administrative Office if you have questions about what it means for a health plan to have grandfathered status and what might cause a plan to lose its grandfathered status. You may also contact the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) at 866-444-3272 or www.dol.gov/ebsa/healthreform. The website includes a chart summarizing the protections that do and do not apply to grandfathered health plans.

## Table of Contents

**Introduction** ..................................................................................................... **1**

**Automated Information System** ...................................................................... **1**

**NECA-IBEW Website** ...................................................................................... **2**

**Summary of Benefits** ....................................................................................... **4**

    Eligible Employees Only ................................................................................ 4

    Eligible Employees and Dependents ............................................................. 4

**Plan Definitions** ............................................................................................... **9**

**Summary of Eligibility Rules** ........................................................................ **12**

    Construction Bargaining Group Employees
    (Based on Hourly Contribution Rate) ......................................................... 12

    Non-Bargaining Construction Employees and Non-Construction
    Bargaining Group Employees (Based on Monthly Contribution Rate) ...... 16

    Special Enrollment Rights ........................................................................... 17

    Pre-Existing Condition ................................................................................ 18

    Dependent Eligibility .................................................................................. 19

    Eligibility During Disabilities ..................................................................... 21

    Continuation of Coverage During Family and Medical Leave ................... 22

    Continuation of Coverage During Military Leave ...................................... 22

    Withdrawal of Local Union ......................................................................... 23

    Rescission of Coverage ............................................................................... 24

    Keep Your Fund Records Up to Date ......................................................... 24

**COBRA Continuation Coverage Self-Pay Rules** ......................................... **25**

**Retiree Benefits** .............................................................................................. **27**

**Reciprocity** ..................................................................................................... **30**

**Death Benefits** *Employees Only* ................................................................... **30**

    Beneficiary Selection .................................................................................. 30

**Accidental Death and Dismemberment Benefits** *Employees Only* ............. **31**

**Weekly Income Benefits** *Employees Only* ................................................... **32**

    Limitations .................................................................................................. 32

    Termination of Benefits .............................................................................. 33

    Taxation of Weekly Income Benefits ......................................................... 33

**Comprehensive Major Medical Benefits** *Employees and Dependents*...............**34**

How the Plan Works ...............................................................................34

Preferred Provider Organization ...........................................................35

Covered Medical Expenses.....................................................................36

Medical Exclusions and Limitations.......................................................42

Extension of Medical Benefits ...............................................................44

**Prescription Drug Benefits** *Employees and Dependents* ......................................**45**

Prescription Drug Calendar Year Deductible ............................................45

Retail Pharmacy Program .........................................................................45

Mail-Order Prescription Drug Program ....................................................46

Covered Medications ................................................................................47

Exclusions................................................................................................47

**Dental Benefits** *Employees and Dependents* ....................................................**49**

Covered Dental Expenses .........................................................................49

Dental Exclusions and Limitations ..........................................................51

Extension of Dental Benefits ...................................................................52

**Vision Benefits** *Employees and Dependents*.....................................................**53**

Covered Vision Expenses ........................................................................53

Vision Exclusions ....................................................................................53

**Wellness Power: Wellness and Disease Management Benefits** .........................**55**

Health Risk Assessment............................................................................55

Wellness Programs ...................................................................................55

NurseLine ................................................................................................56

Health Reference and Video Library ........................................................56

Disease Management Programs ................................................................56

Earning Health Reimbursement Arrangement Rewards ............................56

**Health Reimbursement Arrangement (HRA)**.....................................................**57**

HRA Eligibility........................................................................................57

Establishing an HRA Account ..................................................................57

Your HRA Balance ..................................................................................58

Reimbursable Expenses ...........................................................................59

Expenses Not Eligible for Reimbursement ...............................................62

Claim and Reimbursement Procedures .....................................................63

Claim Submission ....................................................................................65

**Other Plan Features**...................................................................**66**

    Coordination of Benefits............................................... 66

    Reimbursement, Subrogation, and Loan Agreements................... 69

    Recovery of Overpayments and Erroneous Payments ................ 70

    Provider Self-Audit Program ....................................................... 70

**General Limitations and Exclusions** ....................................... **72**

**Claims and Appeals Procedures** .............................................. **74**

    Death Benefit Claims ................................................................ 74

    Accidental Death and Dismemberment Benefit Claims............................ 75

    Weekly Income Benefit Claims .................................................. 75

    Health Care Benefit Claims ....................................................... 76

    Prescription Drug Benefit Claims .............................................. 78

    Health Reimbursement Account (HRA) Claims......................... 78

    If Your Claim is Denied............................................................. 78

    Appealing the Denial of Your Claim ......................................... 79

    Authorized Representative ......................................................... 80

**Important Information about the NECA-IBEW Welfare Trust Fund** ........... **82**

    ERISA Rights ............................................................................ 84

**Board of Trustees** ..................................................................... **87**

**Participating Local Unions**........................................................ **88**

# Introduction

This booklet contains only highlights of certain features of the NECA-IBEW Welfare Trust Fund Base Plan for Active Employees and their dependents in effect as of January 1, 2013. Full details are contained in the Plan Documents, Trust Agreements, insurance contracts and the collective bargaining agreements that establish the Plan provisions. If there is a discrepancy between the wording here and the Plan Documents that establish the Plan, the Plan Document language will govern. The Trustees reserve the right to amend, modify, or terminate the Plan at any time. This Summary Plan Description (SPD) booklet replaces and supersedes the prior SPD. If the Plan is amended or modified, you will receive written notice of such change.

The Plan's benefits are not guaranteed by the Board of Trustees, any participating employer, union, or any other individual or entity. Plan benefits may be provided only from the assets in the Plan that are collected and available for such purposes. The Board of Trustees reserves the right to interpret, amend, modify, or terminate all or a part of this Plan and to take any action deemed desirable to preserve the Plan's financial stability.

# Automated Information System

Please use the automated information system when calling about eligibility. The system is very efficient. To use the system:

- Dial 800-765-4239.

- When your call is answered, press the number nine (9) for eligibility status (it is not necessary to listen to the menu of options):
  - The system will tell you to press the number one (1).
  - The system will again tell you to press the number one (1).
- The system will then ask you to enter your unique ID number. You can find your unique ID number on your BlueCross BlueShield card and/or your Express Scripts card.
  - Then the system will ask you to enter your birth date using eight digits (Example: If your birth date is May 15, 1935, enter 05151935).

At this point, the system will give you your eligibility status. If you are covered, the system will notify you of the date through which you are covered.

Please use this system for eligibility verification rather than calling the Welfare Trust Fund Administrative Office.

# NECA-IBEW Website

The website is designed to be a resource for NECA-IBEW members, their families and others requiring information about our organization or the benefits administration of the Welfare Trust Fund and Pension Trust Fund.

The NECA-IBEW Board of Directors and the Board of Trustees are dedicated to making the Funds easily accessible to participants. Please contact us with questions, for additional information or if you have suggestions for other website features that might be helpful to you.

Please check the website periodically for updates and enhancements, which will be posted as developments occur. Currently, the website gives you the opportunity to:

- Access an electronic version of this NECA-IBEW Welfare Trust Fund Base Plan Summary Plan Description;

- Access the NECA-IBEW Welfare Trust Fund Alternative Plan Summary Plan Description;

- Access the NECA-IBEW Welfare Trust Fund Supplemental Retirement Benefit Plan Summary Plan Description;

- Access the NECA-IBEW Welfare Trust Fund Plan Document;

- Access the NECA-IBEW Pension Trust Fund Summary Plan Description and Plan Document;

- Access current and past issues of the NECA-IBEW Welfare Trust Fund newsletters;

- Access information about your Health Reimbursement Account (HRA), including a list of eligible expenses and reimbursement forms;

- Access claim forms and other forms;

- Check on claims and eligibility status for you and your family;

- Find out more about your medical and prescription drug coverage; and

- Contact the Welfare Trust Fund Administrative Office.

Most information is accessible without logging into the site; but, to check on claim and eligibility status, you must be a registered user.

## Instructions for Registering on the Website

**Please read all of the following instructions before you go to the website to register.**

- Go to www.neca-ibew.org.

- Click on **Benefits Log In** at the top of the page.

2

- ■ When the "NETime Benefits Login" page opens:
  - • **If you've already registered**, enter your "Username" and "Password" and click "Login"; or
  - • **If you're registering as a new user**, click "Request User Name."

When you register for the first time, another page will open for you to register. You will need to fill in:

- ■ User Type – either Member or Dependent.
- ■ First Name.
- ■ Last Name.
- ■ Your Social Security Number.
- ■ Date of Birth.
- ■ Zip Code (five-digit number only).

Then click the "Submit" button. This screen will allow you to enter the username and password of your choice. Remember, each person has to be logged in separately. If you log in, you will see only information that pertains to you.

This screen will also request that you answer challenge questions. A successful response to a challenge question permits a resetting of your password in case you forget it.

Once you have logged in, you will be at the benefits page where you can use the menu links to view specified information. You will be able to view claims data, eligibility and pension information, if it applies to you.

For HIPAA (Health Insurance Portability and Accountability Act) security, each family member needs to log in separately to view their personal information.

**Points to Remember**

- ■ Information on the website is updated on a nightly basis.
- ■ After you have viewed your personal information, there is a log out link at the top right of the page. This is to maintain the security of the website. In addition to this, at the bottom of each page, you can see a padlock, which verifies security.
- ■ If you have unsuccessfully tried to log in three times and each attempt has failed, you will need to contact the Fund by e-mail at info@neca-ibew.org to have your password reset.

## Summary of Benefits

### Eligible Employees Only

#### *Death Benefits*

Active Employee.................................................................................$20,000

#### *Accidental Death and Dismemberment Benefits*

Full Benefit Amount ..........................................................................$20,000
For Dismemberment Benefits, see page 31.

#### *Weekly Income Benefits*

Weekly Benefit
First 6 weeks.................................................................................$300
7th through 12th week ..................................................................$400
13th through 26th week ...............................................................$500
Maximum Number of Weeks per Period of Disability .............................................26
Note:
- If the Disability due to Sickness lasts more than eight weeks, the Plan will retroactively pay benefits for the first week of the Disability.
- Treatment resulting from an Accident must occur within 14 days of the Accident.
- Disabilities lasting longer than 13 weeks are subject to large case management review.

For additional information, see page 32.

### Eligible Employees and Dependents

#### *Comprehensive Major Medical Benefits*

Benefits are payable for the Allowable Charge for Covered Medical Expenses that are Medically Necessary for the treatment of a Sickness or Injury. This Plan contains limitations on Pre-Existing Conditions for participants and dependents age 19 and over; see page 18. Comprehensive Major Medical Benefits are only paid after you meet the calendar year Deductible. Comprehensive Major Medical Benefits pays benefits as shown on the following pages.

**Annual Maximum (Effective January 1, 2013)**................................................$2,000,000
**Annual Maximum (Effective January 1, 2014)**........................................No maximum

**Calendar Year Deductible**
Individual...................................................................................$500
Family Maximum .......................................................................$1,500

**Coinsurance Plan Pays** (after Deductible)
PPO Provider .........................................90% of first $15,000 of Allowable Charges, 100% thereafter Non-PPO Provider..........................75% of first $6,000 of Allowable Charges, 100% thereafter

**Calendar Year Out-of-Pocket Maximum** (after Deductible)

    Individual ..................................................................................$1,500

    Family Maximum ........................................................................$3,000

**Non-Accident Emergency Room Deductible**

    Deductible .................................... $50 per visit after first two visits per calendar year

    (Copayment does not apply to Deductible or Out-of-Pocket Maximum)

**Physician Office Visits**

    Copayment ....................................................................................$10 per visit

    (Copayment does not apply to Deductible or Out-of-Pocket Maximum)

**Chiropractic Treatment**

    Coinsurance Plan Pays .................................................................. 50%

    Calendar Year Maximum............................................................. 48 visits

    Calendar Year Out-of-Pocket Maximum ............................................None

**Temporomandibular Joint Dysfunction (TMJ)**

    Coinsurance Plan Pays .................................................................. 75%

    Lifetime Maximum ......................................................................$2,000

    (for participants and dependents age 18 and over; no maximum for dependents under age 18)

**Testosterone Replacement Therapy**

    Calendar Year Maximum..............................................................$2,500

    (Requires verification of Medical Necessity and lab results showing deficiency.)

**Growth Hormones**

    12-Month Maximum...................................................................$15,000

    Lifetime Maximum ....................................................................$50,000

**Physical/Massage/Speech/Occupational Therapy**

    Physical/Massage Therapy Calendar Year Maximum .................................... 48 visits

    Speech Therapy Calendar Year Maximum .............................................. 48 visits

    Occupational Therapy Calendar Year Maximum ........................................ 48 visits

    (Limits are for eligible individuals age 6 and older; benefits for dependents younger than age 6 are unlimited as long as the dependent is making ongoing therapeutic progress.)

**Hearing Aid Benefit**

    For participants and dependents age 18 and older ..................................$1,250 per ear once every 5 years

    For dependents under age 18 ...............................................................No maximum

    EPIC Hearing Service Plan....................................................... Access to discounts on hearing exams, hearing aid devices and hearing aid batteries

## *Organ Transplant Benefits (Centers of Excellence)*

Transplant surgeries covered are those defined as non-Experimental by the Centers for Medicare and Medicaid Services (CMS) for the condition being treated including, but not limited to: kidney, bone marrow, liver, heart, lung, heart/lung, pancreas, and

pancreas/kidney. Pre-certification by the Fund Office is required for Medical Necessity; otherwise benefits are not payable. In addition, amounts paid when a non-Centers of Excellence (COE) facility is used do not apply to the Out-of-Pocket Maximum. The participant must contact the Welfare Trust Fund Administrative Office if the participant or a dependent is a candidate for transplant surgery before incurring any expenses.

**Calendar Year Deductible** ................................................Comprehensive Major Medical
Deductible of $500 per person

**Coinsurance Plan Pays**
COE Facility ................................................. 90% of Covered Charges up to $15,000;
100% thereafter
Non-COE Facility ............................................50% of discounted charges,
based on the negotiated COE fee

**Calendar Year Out-of-Pocket Maximum**
COE Facility ............................................................Comprehensive Major Medical
Out-of-Pocket Maximum of $1,500 plus Deductible
Non-COE Facility ........................................... No Out-of-Pocket Maximum

**Immunosuppressive Medications**
Retail Pharmacy Prescription Drug Program
(only if not available through Mail-Order Prescription Drug Program)
Maximum Supply ...............................................................30-day supply
Copayment
Generic.............................................................$25 per prescription
Brand Name........................................................$50 per prescription
Out-of-Pocket Maximum ..................................................... Does not apply
Mail-Order Prescription Drug Program
Maximum Supply ...............................................................90-day supply
Copayment
Generic.............................................................$25 per prescription
Brand Name........................................................$50 per prescription
Out-of-Pocket Maximum ..................................................... Does not apply
Organ Procurement Benefit..................................... $20,000 maximum (payable at 100%)
not subject to Deductible; included as part of the Comprehensive
Major Medical Lifetime Maximum


*Behavioral Health Benefits*

Behavioral Health Benefits apply towards the Comprehensive Major Medical Benefits Plan Year Annual Deductible and Out-of-Pocket Maximum. They are covered at the same Comprehensive Major Medical Benefits Network and Non-Network Coinsurance rates and are subject to the same Physician Office Visit Copayment. Behavioral Health Benefits include Mental Health and Substance Abuse services (both inpatient and outpatient).

## *Prescription Drug Benefits*

Prescription Drug Calendar Year Deductible.................................................$50 per person Copayment

      Prescription Drug Calendar Year Deductible .......................................$50 per person Copayment

Participating Retail Pharmacy (up to a 34-day supply)*

      Generic......................................................................................$10 per prescription

      Brand Name ..........................................................................$15 per prescription**

      Specialty Medications.............................................................. 10% coinsurance up to $300 per prescription fill***

Non-Participating Retail Pharmacy (up to a 34-day supply)*......................................... 50%

Mail-Order Prescription Drug Program (up to a 90-day supply)

      Generic......................................................................................$20 per prescription

      Brand Name ..........................................................................$30 per prescription**

      Specialty Medications...................................................... 10% coinsurance up to $300 per prescription fill***

     \*      For maintenance medications, only the original prescription and first two refills may be purchased through the Retail Pharmacy Prescription Drug Program. The third refill and all subsequent refills must be filled through the Mail-Order Prescription Drug Program.

    \*\*     If a generic is available, you pay the brand name Copayment plus the difference in cost between the generic and brand name prescription.

   \*\*\*    If you were receiving specialty medications prior to January 1, 2013, you will continue to pay the generic or brand name co-payments provided under the retail or mail order program, as applicable. You may also prepay for your specialty medications and send proof of payment listing the prescription to the Fund Office for reimbursement. You will be reimbursed under the major medical benefit and will be subject to the scheduled deductible and out-of-pocket limits.

## *Dental Benefits*

Calendar Year Maximum......................................................................$1,500 per person
(for participants and dependents age 18 and over; no maximum for dependents under age 18)

Orthodontia Lifetime Benefit...............................................................................50% of the initial payment up to $2,000 per person

Coinsurance Plan Pays

      Type I..................................................... 90% of Allowable Charges up to maximum

      Type II ................................................... 85% of Allowable Charges up to maximum

Type III ..................................................... 50% of Allowable Charges up to maximum

Orthodontia ............................................. 50% of Allowable Charges up to maximum

### Vision Benefits

Coinsurance Plan Pays ................................................................................................ 100%

Calendar Year Maximum for participants and dependents

Age 18 and Older ..................................................................................... $300 per person

(no maximum for dependents under age 18)

- Coverage during a Calendar Year for Participants and dependents age 18 and over includes eye exams, lenses, frames and a one-year supply contact lenses. For additional information, see page 53.

- Coverage for dependents under age 18 includes eye exams and any one of the following options per Calendar Year:

  - One set of frames and one set of lenses; or

  - A one-year supply of contact lenses; or

  - One set of frames and a one-year supply of contact lenses.

# Plan Definitions

Here are a few definitions to help you understand the benefits in this Summary Plan Description:

**Allowable Charge:**

- With respect to a network (PPO) provider, the term "Allowable Charge" is the negotiated fee/rate set forth in the agreement with the participating network professional provider, facility or organization and the Plan.

- With respect to an out-of-network (non-PPO) provider, the "Allowable Charge" means the amount determined by the Board of Trustees that the Plan will pay for a particular service or supply, as determined by the organization with which the Fund contracts to make such a determination. Under no circumstances will the Plan pay an Allowable Charge for out-of-network services or supplies that is determined by any provider, facility or other person or organization other than the Board of Trustees, or organization designated by the Board of Trustees.

- The Board of Trustees has determined Allowable Charge to mean the amount most consistently charged by a licensed physician or other professional provider for a given service. An Allowable Charge refers to a charge that is within the range of usual charges for a given service billed by most physicians or other professional providers with similar training and experience in a given geographic area. When considering the range of usual charges, the Plan may consider discounted rates allowed by network providers as a basis for Allowable Charges.

**Behavioral Health Disorder:** Any illness that is defined in the mental disorders section of the current edition of the International Classification of Diseases (ICD) manual or is identified in the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), including a psychological and/or physiological dependence or addiction to alcohol, psychiatric drugs or medications regardless of any underlying organic cause.

This includes, among other things, autism, depression, schizophrenia and substance abuse and treatment that primarily uses psychotherapy or other psychotherapist methods. Substance abuse means a psychological and/or physiological dependence or addiction to alcohol or drugs or medications, regardless of any underlying physical or organic cause and/or other drug dependency as defined by the current edition of the ICD manual or identified in the current edition of the DSM.

**Coinsurance or Copayment:** When the Plan pays a percentage of Covered Expenses and you pay the rest, this is called Coinsurance. A Copayment is the flat dollar amount that you are responsible for paying before the Plan begins to pay certain Covered Expenses.

**Covered Medical Expenses or Covered Expenses:** The Allowable Charges incurred for Medically Necessary covered medical services and supplies required for treatment. These must be recommended and approved by the attending physician and must be consistent with the symptoms or diagnosis of the condition.

**Deductible:** A fixed dollar amount per person or family of Covered Expenses that you are obligated to pay each calendar year before Comprehensive Major Medical or Prescription Drug Benefits are payable.

**Experimental and/or Investigational:** A service or supply is deemed to be Experimental and/or Investigational if:

- The service or supply is described as an alternative to more conventional therapies in the protocols or consent document of the health care provider that performs the service or prescribes the supply;

- The service or supply may be given only with the approval of an institutional review board, as defined by federal law;

- There is either an absence of authoritative medical, dental or scientific literature on the subject or a preponderance of the literature (published in the United States and written by experts in the field) shows that recognized medical, dental or scientific experts classify the service or supply as Experimental and/or Investigational or indicate that more research is required before the service or supply could be classified as equally or more effective than conventional therapies;

- With respect to services or supplies regulated by the Food and Drug Administration (FDA), FDA approval is required for the service and supply to be lawfully marketed and it has not been granted at the time the service or supply is prescribed or provided or a current investigational new drug or new device application has been submitted and filed with the FDA (however, there are some exceptions); or

- The prescribed service or supply is available only through participation in Phase I or Phase II clinical trials or Phase III experimental or research clinical trials or corresponding trials sponsored by the FDA, National Cancer Institute or National Institutes of Health.

The Trustees have broad discretion and authority to determine if a service or supply is or should be classified as Experimental and/or Investigational. If your procedure is Experimental or Investigational, it may not be covered. If you are not sure if your procedure is Experimental or Investigational or if it is covered, you should call the Welfare Trust Fund Administrative Office before you have the procedure to make sure that it is covered.

**Injury:** Any damage to the body resulting from trauma from an external source.

**Medically Necessary** or **Medical Necessity:** A service or supply that is:

- Provided by or under the direction of a physician or other duly licensed health care practitioner who is authorized to provide and prescribe it;

- Necessary in terms of generally accepted American medical standards;

- Consistent with the symptoms or diagnosis and treatment of a Sickness or Injury;

- Not provided solely for the convenience of the patient, physician, hospital, health care provider or facility;

- Appropriate, as defined by the Plan, given the patient's circumstances and conditions;

- Cost-efficient, as defined by the Plan, for the supply or level of service that can be safely provided to the patient; and

- Safe and effective for the Sickness or Injury for which it is used.

The Trustees, or their designee, determine if a particular service, supply or procedure is Medically Necessary. The Trustees may rely on the advice of medical professionals retained by the Fund to make this determination. The fact that a physician may provide order, recommend or approve a service or supply does not mean that the service or supply will be considered Medically Necessary for the medical coverage provided by the Plan. The Plan reserves the right to decline coverage for new Experimental and/or technologically innovative medical procedures that have not been historically covered, notwithstanding FDA and/or CMS approval of such treatment. The Trustees are the **final determiners** of Medical Necessity for benefits payable under this Plan.

**Out-of-Pocket Maximum:** The portion of Covered Medical Expenses that you must pay, after you meet any applicable Deductibles, before Covered Medical Expenses are paid at 100%.

**Sickness:** A sickness includes:

- A condition when the body's organs do not function normally;

- A condition when a temporary ailment reduces the body's ability to function normally;

- Pregnancy; and

- A Behavioral Health Disorder.

**Utilization Review**: The cost management process that determines whether certain treatments are Medically Necessary. Currently, Hines and Associates, Inc. provides Utilization Review for medical care and behavioral health care. There is no requirement for a participant to call to obtain pre-approval for a hospital admission. However, transplant surgery and bariatric surgery must be pre-certified for Medical Necessity.

# Summary of Eligibility Rules

## Construction Bargaining Group Employees (Based on Hourly Contribution Rate)

If you work under a collective bargaining agreement requiring that your employer contribute an hourly contribution to the Fund on your behalf, you are eligible for benefits after satisfying the Plan's eligibility rules. Continuing eligibility is based on an Hour Bank system, as described on page 14.

### *Initial Eligibility*

Initial eligibility begins on the first day of the second calendar month after you have 420 employer contribution hours made on your behalf in a six-consecutive month period. Self-pay hours do not count toward earning initial eligibility.

You may accumulate the required 420 hours in less than six months. If this is the case, your eligibility begins on the first day of the second calendar month after working 420 hours (note there is a lag month between when eligibility is met and when coverage begins). These hours provide you with eligibility for your first month of coverage. The following is an example of how you may become initially eligible for benefits:

| Month Worked | Monthly Hours Worked | Cumulative Hours Worked | Eligibility |
|---|---|---|---|
| January | 140 | 140 | Not yet eligible. |
| February | 140 | 280 | Not yet eligible. |
| March | 140 | 420 | Initial eligibility met; coverage not yet effective. |
| April | 140 | 560 | Initial eligibility met. Lag month; coverage not yet effective. |
| May | 140 | 700 | Coverage begins first of month based on hours worked in January through March. |

Please note that all hours worked in excess of 420 hours during the initial eligibility period are credited to your Hour Bank (see page 14).

### *Accelerated Eligibility*

The initial 420-hour requirement will be waived for employees of newly organized employer groups, newly indentured first year apprentices, and newly organized employees (stripped) who have never before been eligible under the Plan. Eligibility will begin on the first day of the second calendar month in which at least 140 hours are contributed on their behalf. At least 140 hours must be contributed each month or monthly COBRA Continuation Coverage premiums must be paid, to continue eligibility.

When contributions hours are less than 140 hours in a month, the participant will have to maintain eligibility by making a COBRA Continuation Coverage premium payment. No accumulated Hour Bank hours in excess of 140 can be used to continue eligibility or for adjusted COBRA Continuation Coverage premium payments until at least a total of 420 contribution hours have been credited to the new employee. The hours reported will be credited toward the 420 initially waived. In the event the participant does not maintain eligibility or does not have employer contributions for six consecutive months, the participant will lose his or her accelerated eligibility status and will be required to gain eligibility by satisfying the initial eligibility requirements as explained above.

An Hour Bank is not established for new employees until they have met the initial eligibility requirements. Thereafter, new employees may use their Hour Bank to continue eligibility. For example, if a new apprentice works 160 hours in January, he will become eligible in March; the additional 20 hours will not be credited to an Hour Bank. He must have at least 140 hours for eligibility each month. Once he meets the initial 420 hour-requirement, hours will begin to accumulate in his Hour Bank and he may use his Hour Bank to continue eligibility.

### *Continuing Eligibility*

Eligibility continues on a month-to-month basis as long as:

- You work 140 hours a month;
- The total in your Hour Bank is at least 140 hours; or
- The hours you work in a month combined with the hours in your Hour Bank total 140.

There is a lag month between the month you work and the month those work hours are counted for eligibility and coverage. For example, 140 hours worked in July (or a 140 Hour Bank balance alone or when combined with the hours worked in July) provide you with coverage for September. The following is a sample of a bargaining group employee's use of the Continuing Eligibility and Hour Bank rules:

| Work Month | Hours Worked | Hours Credited to or Drawn from Hour Bank | Hour Bank Balance | Benefit Month |
|---|---|---|---|---|
| Starting Base | | | 480 | February |
| January | 160 | + 20 | 500 | March |
| February | 140 | 0 | 500 | April |
| March[1] | 100 | - 40 | 460 | May |
| April | 0 | - 140 | 320 | June |
| May | 0 | - 140 | 180 | July |
| June | 140 | 0 | 180 | August |
| July | 160 | + 20 | 200 | September |
| August | 90 | - 50 | 150 | October |
| September | 0 | - 140 | 10 | November |
| October[2] | 0 | COBRA/Hours | 0 | December |
| November | 0 | COBRA | 0 | January |

[1]    Because the participant only worked 100 hours in March, the hours shortage (40 hours) is deducted from the Hour Bank to maintain eligibility. This provided the participant with the 140 hours required to maintain eligibility.

[2]    If the participant does not work in October, eligibility will end on November 30. An adjusted COBRA Continuation Coverage premium will be due for December.

### Extended Eligibility for Organ Donors

The Fund will freeze your Hour Bank and grant 21 months of eligibility due to disability to all active members who donate an organ either to a family member or to another participant covered under the Welfare Trust Fund. (Family members include a spouse, child, sibling, parent, grandchild, or grandparent.)

### Hour Bank

All hours worked in excess of 420 hours worked during the initial eligibility period or in excess of 140 hours each month after meeting the Plan's initial eligibility requirements will be credited to an individual Hour Bank. Accumulated hours in your Hour Bank allow you to continue eligibility during periods of unemployment and underemployment. The maximum balance permitted to accumulate in your Hour Bank is 840 hours (equivalent to six months of eligibility). An Hour Bank is not established in your name until you have met the Plan's initial eligibility requirements.

Participants who engage in Prohibited Employment and work for a Non-Contributing Employer will forfeit the hours in their Hour Bank and will lose their eligibility for Fund coverage. If you lose your eligibility for coverage as a result of engaging in Prohibited Employment and later return to work for a contributing employer, you will have to start over and satisfy the Fund's initial eligibility requirements.

14

A Non-Contributing Employer is defined as any employer that performs work in the electrical construction industry that is covered by an area-wide construction industry collective bargaining agreement but does not make contributions to this Plan. Public employers are not considered non-contributing employers.

Prohibited Employment is defined as work that regularly and historically is performed by electrical workers, but is not being performed through a contributing employer. Any employment that requires contributions to this Plan is not considered prohibited employment.

### Termination of Eligibility

In general, your eligibility ends on the last day of the month in which you have less than 140 hours in your Hour Bank. However, your eligibility may also end as of:

- The 31st day following the date that your Union, representing you for collective bargaining, withdraws from participation in the Trust Fund;

- The first day of the month following the month in which the collective bargaining agreement under which you are working no longer provides for the rate of contribution established by the Trustees for participation in the Trust Fund, unless the Trustees decide to allow eligible employees to make a self-contribution of the rate differential in a timely manner in accordance with the rules established by the Trustees;

- The last day of coverage available to you from the use of Hour Bank reserves or COBRA Continuation Coverage following the date you enter the Armed Forces of the United States; or

- The 31st day following the date that the participating employer that had been making contributions on your behalf withdraws from participation in the Trust Fund.

You will be provided with a certificate of creditable coverage under the Plan. This may help reduce or eliminate any pre-existing condition limitation you may have under a new group medical plan.

You will also be given an opportunity to continue coverage on a self-pay basis if you choose to elect COBRA Continuation Coverage. See below and refer to the Plan Document for further details. You may view and obtain a copy of the Plan Document at the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org.

### Reinstatement of Eligibility

If your eligibility ends, it may be reinstated on the first day of the second calendar month following the month in which you have 140 contribution hours credited on your behalf within 12 months of your termination of eligibility.

If, after 12 consecutive months, your Hour Bank has less than 140 hours and there have been no hours credited by participating employer contributions, your Hour Bank balance will be reduced to zero and you must satisfy the Plan's initial eligibility requirements to

again be eligible. This 12-consecutive-month requirement is waived for an Employee who has been on COBRA for more than 12 months.

## Non-Bargaining Construction Employees and Non-Construction Bargaining Group Employees (Based on Monthly Contribution Rate)

The Fund also covers two other categories of full-time employees (working more than 20 hours a week), whose employer is obligated by a written agreement to contribute a monthly contribution to the Fund as follows:

- Non-bargaining construction employees whose employer has signed a participation agreement to pay a monthly contribution based on 160 hours per month.

- Non-construction employees whose employer is obligated to pay a monthly contribution based on a collective bargaining agreement.

### *Initial Eligibility*

You become eligible on the first day of the second calendar month following the month in which employer contributions are made on your behalf. For example, if you start work in January, you become eligible for benefits March 1 based on your employer's contribution (160 hours) paid in February for the work you performed in January.

### *Continuing Eligibility*

Once eligible, your eligibility continues on a month-to-month basis as long as a monthly employer contribution is received for you on time by the Welfare Trust Fund Administrative Office. Each month that you have the sufficient contributions made on your behalf enables you to be eligible during the second calendar month after the month the contribution was made.

### *Termination of Eligibility*

In general, eligibility ends on the last day of the month following the month for which a monthly contribution is last paid by your employer on your behalf. For example, if your employer last pays a contribution for your work in April, your eligibility will end on June 30, but you may continue eligibility through COBRA as explained later. However, your eligibility may also end as of:

- The last day of the second calendar month in which you do not satisfy the requirements for continued eligibility;

- The 31st day following the date on which your collective bargaining or participation agreement is terminated or fails to provide for the required monthly contribution;

- With respect to your eligibility by payment in accordance with COBRA Continuation Coverage, the first day of the month following the month your premium was not received;

- The last day of coverage available to you from the use of Hour Bank reserves, USERRA continuation coverage, or COBRA Continuation Coverage following the date you enter the Armed Forces of the United States; or

- The 31st day following the date that the employer that had been making contributions on your behalf withdraws from participation in the Trust Fund.

When your coverage ends, you will be provided with a certificate of creditable coverage from this Plan. This may help reduce or eliminate any pre-existing condition limitation under a new group medical plan.

You will also be given an opportunity to continue coverage on a self-pay basis if you choose to elect COBRA Continuation Coverage. See below and refer to the Plan Document for further details. You may view and obtain a copy of the Plan Document at the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org.

### *Hour Bank Eligibility (Non-Bargaining Construction Only)*

Non-bargaining construction employees will have 20 hours credited to an individual Hour Bank account for each monthly employer contribution received on their behalf. The accumulated hours in their individual Hour Bank account can then be used for future eligibility the same way as the Hour Bank system works for bargaining unit construction employees (see page 14).

This Hour Bank eligibility system does not apply to non-construction bargaining group employees.

All other eligibility rules and conditions of coverage, including the Pre-Existing Condition limitation and continuation of coverage during FMLA or military leave, apply. If you have any questions, please call the Welfare Trust Fund Administrative Office at 800-765-4239.

## Special Enrollment Rights

Special enrollment is allowed for Active Employees or their dependents who originally declined coverage if they:

- Had other coverage and either later had a loss of eligibility for that coverage or employer contributions toward the other coverage were terminated; or

- Were on COBRA Continuation Coverage under another plan, but their eligibility expired.

If an Employee gets married, has a natural child, has children placed for adoption or adopts a child, the Employee is entitled to special enrollment, along with the children placed for adoption or adopted child or birth child and spouse if enrollment is requested within 30 days of the marriage, birth, or adoption.

Special enrollment is permitted for you and your eligible dependents if you request special enrollment within 60 days immediately following the date you or your dependent:

- Loses Eligibility for Medicaid or the State Children's Health Insurance Program (SCHIP) coverage; or

- Becomes eligible to participate in a premium assistance program under Medicaid for SCHIP.

If you lose coverage because you reached the lifetime maximum benefit prior to the change in the maximum benefit under the Patient Protection and Affordable Care Act of 2010 (Health Care Reform), you will be permitted a special enrollment within the appropriate timeframe allowed under the law.

## Pre-Existing Condition

A Pre-Existing Condition limitation applies for six months from your enrollment date on any expense related to treatment of a pre-existing condition. A Pre-Existing Condition is a condition (whether physical or mental), regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within six months of your enrollment date. Your enrollment date is the first day of your waiting period that begins before you actually become covered for benefits under the Plan. The Pre-Existing Condition limitation applies to all participants who are age 19 and over, unless you provide acceptable proof of prior coverage to shorten or eliminate the delay in coverage.

You must submit a certificate of creditable coverage from your prior health care plan or insurance policy to prove that you are entitled to a credit for the time you were covered under the other plan or policy. If you do not have a break in coverage before your initial enrollment date, any prior coverage can be used to shorten or eliminate the delay in coverage. A break in coverage means a period of 63 days or more between the date coverage ended under the other health care plan or insurance policy and your initial eligibility date under this Plan. The waiting period for your initial eligibility does not count as part of this 63-day period. Your previous employer, insurer, or plan is required by law to provide this certification to you on request.

If there **has been** a break in coverage of 63 or more days, no credit will be provided for any periods of coverage before the break in coverage. A leave of absence under the provisions of the Family and Medical Leave Act or the Uniformed Service Employment and Reemployment Rights Act is not counted as a break in coverage.

If there has been **no** break in coverage, the maximum period of exclusion of coverage for Pre-Existing Conditions described in this section will be reduced by the period of time that you, your spouse, and/or any of your dependent children were covered under any health insurance policy or plan that provides reimbursement for hospital and medical expenses or provides hospital and medical services. This includes COBRA Continuation Coverage, any group health care plan or insurance policy (whether or not it is employer-sponsored), any individual health insurance policy or program, Medicare, Medicaid, military sponsored health care, program of the Indian Health Service, state health benefits risk pool, the federal employees health benefit program, a public health plan, and/or any health benefit plan provided under the Peace Corps Act.

Even if the Pre-Existing Condition limitation applies to you, it will not apply to pregnancy and high blood pressure prescription drugs. The Pre-Existing Condition limitation does not apply to children first placed in your home for adoption during this period.

This Pre-Existing Condition limitation also applies if you lose eligibility, are reinstated after 12 months, and you do not provide a certificate of creditable coverage for the period you were not eligible.

Please note that the Pre-Existing Condition limitation will no longer apply effective January 1, 2014, as a result of Affordable Care Act regulations.

## Dependent Eligibility

Your dependents are eligible for coverage when you are eligible for coverage. Your eligible dependents include your:

- Spouse, provided you are not divorced or legally separated; and
- Children, provided they are:
  - Are under 26 years of age;
  - Are over age 26, permanently and totally disabled and incapable of any gainful activity and/or self-sustaining employment due to a medically determinable physical or mental impairment that began before the child attained age 26 and is expected to result in death or last for a continuous period of 12 months or more. However, if your disabled child loses eligibility for coverage because he or she becomes employed and self-sustaining, the child may again be considered a dependent if he or she once again becomes permanently and totally disabled and incapable of any gainful activity and/or self-sustaining employment due to a medically determinable physical or mental impairment;
  - Are named under a Qualified Medical Child Support Order (QMCSO). A "QMCSO" is a medical child support order that:
    - Is made pursuant to a state domestic relations law (including a community property law) or certain other state laws relating to medical child support; and
    - Provides for child support or health benefit coverage for a child of a participant under a group health plan and relates to benefits under the plan.

In addition to children named under a Qualified Medical Child Support Order (QMCSO), children may include your:

- Biological children;
- Legally adopted children, including children placed with you for adoption;
- Stepchildren;
- Foster children; and

19

- Grandchildren.

To be considered your dependents, your adult disabled children over age 26 and your grandchildren under age 26 must also depend on you for more than 50% of their support and maintenance during the calendar year and have a principal place of residence with you for more than one-half of the calendar year. Legal guardianship is also required for grandchildren. If your adult disabled child who is age 26 or older or your grandchild does not live with you during the calendar year, they will still be considered your dependent children, provided:

- You are divorced or legally separated under a decree of divorce or separate maintenance, separated under a written separation agreement, or have lived apart from the child's other parent at all times during the last six months of the calendar year;

- You and/or the child's other parent provide more than 50% of the child's support and maintenance during the calendar year; and

- The child is in your custody or the custody of the child's other parent for more than one-half of the calendar year.

Your dependents' eligibility for coverage ends on the earliest of the:

- Date the Plan ends;

- Date you are no longer eligible;

- Last day of the month your dependent no longer meets the Plan's definition of dependent (for example, coverage for your enrolled eligible children will end on the last day of the month in which they turn age 26);

- Date coverage would end in accordance with other Plan provisions;

- With respect to a legal separation, last day of the month that an order or decision of the court is entered or, in the event that there is no court order or decision, last day of the month the parties reach agreement on the terms of the separation; or

- With respect to a divorce, last day of the month the divorce decree is entered by the court and finalized.

### If Your Spouse Has Other Coverage Available

If your spouse is eligible for other health care coverage through an employer plan, regardless of the cost to your spouse, he or she must take that coverage or he or she will not be covered under the Plan. If your spouse's employer does not offer health care coverage or if your spouse is not eligible for the coverage offered, you need to submit a letter to the Welfare Trust Fund Administrative Office from the employer to that effect.

**Private Insurance Policy.** There may be instances where your spouse may prefer to purchase a private insurance policy rather than elect his or her employer's coverage. In these instances, your spouse may elect to purchase private insurance, provided it is

comprehensive coverage that is comparable to your spouse's employer's coverage. The Fund will then consider this private insurance policy as your spouse's other coverage and your spouse will continue to be covered under the Plan, with the Fund paying second, after your spouse's other coverage.

If your spouse has other coverage, either through an employer plan or a private insurance policy, the Fund will pay benefits second, after the other coverage. This provision helps manage the Fund's health care costs. While this provision is beneficial in helping the Fund reduce expenses, it is also beneficial for your spouse because your spouse will have coverage through more than one plan.

It is your responsibility to notify the Fund if your spouse has other coverage through an employer or private policy. If the Fund learns that your spouse has other coverage and does not notify the Fund or refuses to take the available coverage, your spouse will no longer be covered under the Fund's Plan.

If your spouse is eligible for other coverage and does not enroll for that coverage when eligible, your spouse's coverage under this Plan will end as of the date your spouse is eligible for such other coverage. In addition, benefits will be backdated to the date your spouse could have enrolled in the other coverage. For example, if your spouse becomes eligible for, but does not elect, coverage through his or her employer on January 1, the Plan will not cover any of your spouse's expenses incurred on and after January 1. If the Fund is not aware that your spouse had other coverage available until April 1, your spouse's coverage will still be considered to have ended as of January 1, not April 1. Therefore, any expenses incurred between January 1 and April 1 will not be covered under the Plan. To avoid any problems that this may cause, your spouse should enroll for any available medical coverage offered by his or her employer.

## Eligibility During Disabilities

In the event you become disabled (as defined by the Plan), the Fund will freeze your Hour Bank and grant coverage, which may continue for up to a maximum of 21 months from the date of the Injury or Sickness.

Disability months are counted from the first day of the month following the month in which the disability begins. If, at the end of the 21-month period, you have not recovered from your disability, you may continue your eligibility using hours remaining in your Hour Bank. Bank hours will be drawn down at a rate of 140 hours per month. Once your Hour Bank is reduced to zero, you may continue eligibility by electing COBRA Continuation Coverage for up to a maximum of 36 months. Thereafter, you must have at least three consecutive months of eligibility, based on employer contributions, to requalify for the 21-month extension of eligibility due to disability.

Please note that the 21-month extension of eligibility due to disability is not available:

- During any period that you are working for compensation or profit, drawing a salary, performing light-duty work, or drawing unemployment benefits;

- For any condition that does not meet the Plan's definition of disability and that cannot be verified per Plan provisions;

- For any disability for which you willfully fail to follow the treatment plan prescribed by the physician who certified you as disabled; or

- For any circumstances that are described in the *General Limitations and Exclusions* section on page 72.

## Continuation of Coverage During Family and Medical Leave

The Family and Medical Leave Act (FMLA) allows you to take up to 12 weeks of unpaid leave during any 12-month period due to:

- The birth, adoption, or placement with you for foster care or adoption of a child;

- The care of a seriously ill spouse, parent, or child;

- Your serious illness; or

- A qualifying urgent need for leave because your spouse, son, daughter, or parent is on active duty in the armed services in support of a military operation.

In addition, you may be able to take up to 26 weeks of unpaid leave during a 12-month period to care for a service member. The service member must be:

- Your spouse, son, daughter, parent, or next of kin;

- Undergoing medical treatment, recuperation, or therapy for a serious Illness or Injury incurred in the line of duty while in military service; and

- An outpatient or on the temporary disability retired list of the armed services.

During your leave, you will maintain all the coverage offered through the Fund. You will remain eligible until the end of the leave, provided your participating employer properly grants the leave under the federal law and your employer makes the required notification to the Fund. Contact your employer or the Welfare Trust Fund Administrative Office to learn if this leave is available to you.

If you and your employer have a dispute regarding your eligibility and coverage under the FMLA, the Fund will not have any direct role in resolving the dispute and your benefits may be suspended while the dispute is being resolved.

## Continuation of Coverage During Military Leave

Your health care (medical, prescription drug, dental, and vision) coverage will continue if you serve in the uniformed services of the United States (active duty or inactive duty training) for up to 31 days. If you continue in military service for more than 31 days, you may continue your coverage at your own expense for up to 24 months under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA).

However, the Plan allows you to continue your coverage, at your own expense, under these circumstances for up to 36 months.

If you continue your coverage at your own expense, it will stop at the *earliest* of the following:

- The date you or your dependents do not make the required payments within 30 days of the due date;

- The date the Fund no longer provides any group health benefits;

- The date you reinstate your eligibility for coverage under the Plan;

- The end of the period during which you are eligible to apply for reemployment in accordance with USERRA; or

- The last day of the month after 36 consecutive months.

To continue coverage under USERRA, you must elect USERRA continuation coverage within 60 days after the date eligibility for coverage ends due to your service in the uniformed services. You may elect USERRA continuation coverage for yourself and/or your dependents; your dependents do not have a separate right to elect this USERRA continuation coverage and are not entitled to this coverage unless you elect it on their behalf. A monthly premium is required for this coverage. Continuation coverage under USERRA will be administered in the same manner as COBRA Continuation Coverage, and the monthly payment will be the same as the payment under COBRA.

If you are a member of a construction collective bargaining unit, your hours worked and Hour Bank balance as of the last day of eligibility will be "frozen" unless you notify the Welfare Trust Fund Administrative Office, in writing, that you want to use your Hour Bank balance during the period you are serving.

Following your discharge from service, you may be eligible to apply for reemployment with your former employer under USERRA. Such reemployment includes your right to elect reinstatement in any existing health care coverage provided by the Fund through your employer. For more information about paying for your own coverage under USERRA, contact the Welfare Trust Fund Administrative Office at 800-765-4239. In the event of a conflict between the Plan's provision and USERRA, the USERRA's provisions will apply.

## Withdrawal of Local Union

If a participating local union or employer ends participation in the Plan or a participating local union no longer provides in its collective bargaining agreement for the required employer contributions, the eligibility and benefit rights of those local union members, retirees, and dependents become subject to special rules and limits including the following:

- Eligibility ends as of the 31st day following the date contributions are no longer required regardless of any Hour Bank accumulation.

23

- All remaining hours accumulated in individual Hour Banks are canceled and no one has any rights to any of the Plan assets.

- After eligibility ends, all rights to qualify in the future for 21 months of continued eligibility due to total disability, retiree benefits, and reciprocity end. To be eligible again, you must meet the Plan's reinstatement eligibility rules, as stated on page 15.

- Retiree eligibility, eligibility due to disability, and eligibility due to COBRA Continuation Coverage ends as of the 31st day following the date contributions are no longer required because of the participating local union's termination.

## Rescission of Coverage

The Plan may rescind your coverage for fraud, intentional misrepresentation of a material fact, or material omission after the Plan provides you with 30 days advance written notice of that rescission of coverage. The Trustees have the right to determine, in their sole discretion, whether there has been fraud, an intentional misrepresentation of a material fact, or a material omission. A rescission of coverage is a cancellation or discontinuance of coverage that has retroactive effect, meaning that it will be effective back to the time that you should not have been covered by the Plan. However, the following situations will not be considered rescissions of coverage and do not require the Plan to give you 30 days advance written notice:

- The Plan terminates your coverage back to the date of your loss of employment when there is a delay in administrative recordkeeping between your loss of employment and notification to the Plan of your termination of employment.

- The Plan retroactively terminates your coverage because of your failure to timely pay required premiums or contributions for your coverage.

- The Plan retroactively terminates your former spouse's coverage back to the date of your divorce.

For any other unintentional mistakes or errors under which you and your dependents were covered by the Plan when you should not have been covered, the Plan will cancel your coverage prospectively – for the future – once the mistake is identified. Such cancellation will not be considered a rescission of coverage and does not require the Plan to give you 30 days advance written notice.

## Keep Your Fund Records Up to Date

If you move, be sure to notify the Welfare Trust Fund Administrative Office. The Welfare Trust Fund Administrative Office must have your current address on file to ensure that you receive information about your benefits.

It is a good idea to periodically review your beneficiary designation information (see page 30 for more information about designating a beneficiary). If you need to update this information, contact the Welfare Trust Fund Administrative Office.

# COBRA Continuation Coverage Self-Pay Rules

**NOTE:** Detailed information about COBRA Continuation Coverage is available from the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org.

If you or a dependent experiences a qualifying event, you will be considered a qualified beneficiary and you will have the right to continue coverage on a self-pay basis as required under a federal law known as COBRA. You and each of your dependents have an independent right to elect COBRA Continuation Coverage. You must self-pay for COBRA Continuation Coverage. For COBRA Continuation Coverage information, contact:

COBRA Continuation Coverage Department
NECA-IBEW Welfare Trust Fund
2120 Hubbard Avenue
Decatur, IL 62526-2871
800-765-4239.

A qualifying event occurs for you and your dependents when you lose regular eligibility as a result of termination of your employment, having a reduction in hours of work or not having sufficient hours in your Hour Bank. A qualifying event occurs for your dependents if they lose coverage because of your death, entitlement to Medicare, divorce or legal separation, or your dependent child no longer meets the Plan's definition of dependent.

A child born to, adopted by, or placed for adoption with an eligible employee who is on COBRA may be added to the COBRA Continuation Coverage. That child will have the same COBRA rights as any other qualified beneficiary who was covered by the Plan before the event that triggered COBRA Continuation Coverage. The employee must notify the Welfare Trust Fund Administrative Office at the above address or phone number, as soon as possible after the birth or placement to add the child for coverage. Since COBRA Continuation Coverage premium self-payment amounts are established on a composite rate basis, there is no increase to the monthly amount. Like all qualified beneficiaries with COBRA Continuation Coverage, the child's continued coverage depends on the timely and uninterrupted payment of premiums on his or her behalf.

If you elect COBRA Continuation Coverage, you will be entitled to the same type of coverage (Comprehensive Major Medical including Behavioral Health, Prescription Drug, Dental, and Vision) that you had before the event that triggered COBRA, but you must pay for it. COBRA Continuation Coverage does not include Weekly Income, Death, or Accidental Death and Dismemberment Benefits. If there is a change in the health coverage provided under the Plan to similarly situated active members and their families, that same change will be made in your COBRA Continuation Coverage.

Every 12 months, the Trustees establish the monthly COBRA premium self-payment amount. A person who has a qualifying event, makes a timely election, and regularly pays the required monthly premium may self-pay for up to 36 months of COBRA Continuation Coverage. Bargaining employees only may offset their COBRA premium with contributions made on their behalf by employers. This adjusted COBRA premium will not extend the time the employee may continue COBRA Continuation Coverage.

After 36 months, the employee will lose coverage unless he meets the Plan's initial eligibility requirements, as explained on page 12.

The Welfare Trust Fund Administrative Office will notify you and/or your dependents of your COBRA Continuation Coverage rights by mail, sent to the last known address on file when you lose eligibility. Therefore, you should keep the Welfare Trust Fund Administrative Office informed of any changes in your address or the addresses of family members. You should also keep a copy of any notices you send to the Welfare Trust Fund Administrative Office. You and/or your dependents may elect COBRA Continuation Coverage. You will then have 60 days from the date of the Welfare Trust Fund Administrative Office's notice to elect COBRA Continuation Coverage.

If a child loses dependent status or you and your spouse divorce or get legally separated, **it is the responsibility of that individual** to notify the Welfare Trust Fund Administrative Office that a qualifying event has occurred within 60 days from the date of the qualifying event. The Welfare Trust Fund Administrative Office will advise that individual of his or her COBRA Continuation Coverage rights by letter. The Welfare Trust Fund Administrative Office will also provide written notification to individuals that are not entitled to COBRA Continuation Coverage. Such notice will explain why COBRA Continuation Coverage is not available.

An eligible individual who has a qualifying event **will** lose his or her right to COBRA Continuation Coverage before the end of the maximum 36-month period if::

- He or she does not make a timely notice of his or her election for COBRA Continuation Coverage.

- He or she makes a timely election but does not pay the required premium (or the Welfare Trust Fund Administrative Office does not receive the payment within the prescribed time limits.)

- He or she enrolls in Medicare after electing COBRA Continuation Coverage.

- He or she becomes covered as an Employee or dependent under any group health plan, provided such coverage does not contain any exclusions or limitations with respect to any preexisting condition.

- The Plan is terminated by the Trustees.

COBRA Continuation Coverage will count toward creditable coverage if you become covered under another group medical plan. You will receive an updated certificate of creditable coverage under this Plan when your COBRA Continuation Coverage ends.

If COBRA Continuation Coverage ends before 36 months, you will receive written notice explaining why COBRA Continuation Coverage has ended, the date coverage ended, and your rights, if any, to alternative coverage.

# Retiree Benefits

The Plan offers retiree benefits under the Supplemental Retirement Benefit Plan on a self-payment basis. There are two levels of coverage available to retirees and eligible dependents who are not yet eligible for Medicare Parts A and B. Coverage may continue under the Fund's Comprehensive Major Medical Benefits or retirees may elect the Alternative Plan. The Alternative Plan provides a lower level of coverage at a reduced cost. Retirees who select the Alternative Plan will not have the option of re-enrolling in the higher level of coverage. This section contains a summary of how the Supplemental Retirement Benefit Plan works. For more information, see your Supplemental Retirement Benefit Plan Summary Plan Description (SPD) or call the Welfare Trust Fund Administrative Office.

You may be eligible for retiree benefits if you:

- Submit a written application to the Welfare Trust Fund Administrative Office within 90 days of:
    - The last day you work;
    - The date of the award letter, as it appears on the award letter;
    - The date of your Social Security Disability Award; or
    - The expiration of your accumulated Hour Bank.
- Are at least age 55 or totally disabled as defined by the Plan.
- Submit proof of retirement acceptable to the Board of Trustees. If you have reached your Social Security full retirement age and continue to work while receiving Social Security benefits, you will be required to provide additional proof of retirement other than Social Security when your retiree application is received.
- Are eligible for active benefits under the NECA-IBEW Welfare Trust Fund during the month in which you retire or the month immediately before you retire.
- Have been eligible for benefits under the NECA-IBEW Welfare Trust Fund (or working toward eligibility reinstatement at the rate of at least 80 hours per month) for at least 45 of the last 60 months immediately before:
    - The Welfare Trust Fund Administrative Office receives your retirement application; or
    - Your entitlement to a Social Security Disability Award (a closed Social Security Disability Award with a specific starting and ending date does not qualify as a disability pension for these purposes) if you are retiring because of a total disability.
- Waive COBRA Continuation Coverage.

The 60-month period noted above may be extended by up to 30 months (to a maximum of 90 months). This period may be extended by one month for every month that no hours were reported on your behalf, but during which you were seeking employment with a participating local union. Your participating local union must verify, in writing, that you were seeking employment. This may help you to meet the 45-month eligibility rule.

For example, if you only had 40 months of eligibility in the last 60 months before retiring but your participating local union verified, in writing, that you were unemployed and seeking employment for six of those last 60 months, the Fund will look at your last 66 months before retiring (adding one month for each month you were seeking employment). In this instance, since you were eligible for coverage for 46 of the last 66 months before retiring, you will meet this retiree eligibility requirement.

If you retired from a merged Fund and there was not sufficient time for you to accumulate the required 45 of the last 60 months of eligibility under the NECA-IBEW Welfare Trust Fund, you may be eligible for the Supplemental Retirement Benefit Plan if:

- The Trustees of the merged Fund verify that you were eligible under that Fund for at least 45 of the last 60 months before the effective date of your retirement; or

- You were eligible under the NECA-IBEW Welfare Trust Fund and the merged Fund for a combined total of at least 45 of the last 60 months before the effective date of your retirement.

For further information or a retiree application, you may view and obtain a copy of the Plan Document at the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org. Monthly self-payments are required for coverage under the NECA-IBEW Retiree Plan using the automatic electronic fund transfer program.

Retirees eligible for coverage may select the Alternative Plan when they are initially eligible for retiree coverage. If a Retiree and/or their eligible dependent reaches age 65 and is eligible to enroll in Medicare Parts A and B after their retiree coverage begins, they may select the Alternative Plan on January 1 following their 65th birthday. At that time, retirees may select Organ Transplant and prescription drug benefits under the Alternative Plan. The Alternative Plan requires a larger copayment per prescription but does not have a Deductible.

It is important to note that retirees and eligible dependents who are age 65 and eligible for Medicare Parts A and B are covered under the Insured Plan through Monumental Life Insurance Company. Retirees and/or their eligible dependents who are at least age 65 and enrolled in Medicare Parts A and B are eligible for organ transplant and prescription drug coverage under the Welfare Trust Fund.

Retirees and eligible dependents who are enrolled in Medicare Parts A and B due to disability will submit their claims to the Fund Office, which will be coordinated with Medicare, in accordance with the Plan's and Medicare's coordination of benefits provisions. Benefits will be coordinated with Medicare based on a supplemental approach

whether or not the retiree or eligible dependent actually enrolls in Medicare Parts A and B.

For more information, you may view and/or obtain a copy of the Plan Document and/or a copy of the Supplemental Retiree Benefit Plan's SPD at the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org. You may also submit a written request for a copy of the Plan Document or Retiree SPD.

If a Medicare-eligible retired employee or the Medicare-eligible dependent of a retired employee elects Medicare Prescription Drug Coverage (Medicare Part D), the individual will not be entitled to retiree prescription drug benefits under the Fund. Additionally, your monthly premium for coverage under the Welfare Trust Fund will not be reduced as a result of not receiving retiree prescription drug benefits coverage under the Fund. If you enroll for Medicare Prescription Drug coverage and your retiree prescription drug benefits end, you will have one opportunity to re-enroll for retiree prescription drug benefits if you subsequently drop Medicare Prescription Drug Coverage.

The Supplemental Retiree Benefit Plan is based on self-contributions. The Trustees reserve the right to modify the retiree self-contribution rates at any time.

For **retirees with an effective date of retirement prior to January 1, 2002**, the monthly self-contribution rate for single or family benefits is equal to 34.5% of the Active Employee contribution rate multiplied by 160 hours for Retirees or surviving spouses who are Medicare-eligible and elect the Alternative Plan.

The Board of Trustees will determine the self-contribution rate for **Retirees with an effective date of retirement on and after January 1, 2002** who select the Alternative Plan. Payment must be made through the automatic electronic fund transfer program. Payment will be withdrawn a month in advance. Information and authorization forms will be included in the retirement packet sent by the Welfare Trust Fund Administrative Office.

Contact the Welfare Trust Fund Office for the current contribution rate.

# Reciprocity

The NECA-IBEW Welfare Trust Fund is a party to the IBEW/NECA Electronic Reciprocal Transfer System (ERTS).

In the electrical industry, many employees are at times employed by employers under contract to contribute to one Welfare Trust Fund and at other times employed by an employer under contract to contribute to another fund. You are able to maintain eligibility for benefits from this Fund if you work for an employer who contributes to another fund. You must register in person with ERTS at the local union hall. You will be issued a User ID and Password. If an employer contributes to a different fund on your behalf, the money will be electronically transferred to this Fund. You will be able to change your registration or stop transfers at any time. This system will allow you to continue your welfare benefits with minimal interruption.

# Death Benefits
## *Employees Only*

The Death Benefit, as shown in the *Summary of Benefits,* is paid to your beneficiary if you die from any cause while eligible for active benefits. Payment will be made in one lump sum to your beneficiary or beneficiaries or in installments if requested by you or your beneficiary.

## Beneficiary Selection

Benefits are payable to each beneficiary listed on, and in accordance with, the most current information on file at the Welfare Trust Fund Administrative Office. You may make a change to your named beneficiary by completing the required form; the change will become effective upon receipt by the Welfare Trust Fund Administrative Office. If no beneficiary is named, benefits will be paid to your surviving spouse. If no spouse survives you, then the benefit will be paid to your estate.

If there is a named beneficiary, but the beneficiary and any alternate beneficiary die before you, then benefits will be paid to your estate.

# Accidental Death and Dismemberment Benefits
## *Employees Only*

If an employee **accidentally** dies or suffers loss of sight or limb, a benefit is payable as shown in the *Summary of Benefits* on page 4.

The full benefit amount shown on the *Summary of Benefits* is paid for the loss of:

- Life;

- Two hands or feet or the sight of two eyes; or

- Any combination of one foot, one hand, or the sight of one eye.

One-half of the full benefit amount shown on the *Summary of Benefits* is paid for the loss of:

- One hand;

- One foot; or

- The sight of one eye.

Loss of hands or feet means severance at or above the wrist or ankle joint, respectively, and loss of sight means total and irrecoverable loss of sight.

If you suffer more than one of these losses because of any one accident, the Plan pays for only the loss for which the largest benefit is provided.

No payment will be made for any loss incurred wholly or partly, directly or indirectly, by:

- Disease, ptomaine, or bacterial infections, except pyogenic infection of a visible cut or wound accidentally sustained.

- Insurrection, participation in a riot, or war or any act of war, declared or undeclared.

- Military service for any country or organization.

- The claimant during the commission of an assault or felony.

- Medical or surgical treatment, except payment will be made for a death that is caused by negligence of an attending physician.

# Weekly Income Benefits
## *Employees Only*

If you become totally disabled while eligible under the Plan, a Weekly Income Benefit is payable for up to a maximum of 26 weeks per period of disability. Totally disabled or total disability means you are unable to engage in gainful pursuit within the electrical industry or usual occupation and are not eligible for any salary continuation from an electrical employer. Disabilities lasting 13 weeks or longer are subject to large case management review. The amount of your weekly benefit depends on how long you are totally disabled, as shown in the *Summary of Benefits*. If you are disabled for part of a week, you will receive one-seventh of your weekly benefit for each day of disability.

If you become disabled while employed, or within 30 days of the date you were last employed in the electrical industry, benefits will begin on the first day of disability if the disability is the result of an accidental Injury or on the eighth day of disability if the disability is due to a Sickness. If a disability due to a Sickness lasts eight weeks, the Plan will retroactively pay benefits from, and including, the first week. If you become disabled more than 30 days after you were last employed in the electrical industry, your disability will be considered to start on the first day of hospital confinement. (This applies if your eligibility has been extended due to your Hour Bank.)

You are not considered to be working in the electrical industry if you are making self-payments to the Fund, unless you provide written verification of employment on the date of the disability from a participating employer. Upon receipt of written verification from the employer, you will be considered to be employed in the electrical industry. Verification of employment will be confirmed by reviewing the employer's Monthly Payroll Reporting (MPR) for the period in question.

Successive periods of disability are considered one period of disability unless:

- You return to active full-time work and earn eligibility for at least three consecutive months based on employer contributions.

- You are a non-bargaining member who works (as opposed to merely having hours reported on your behalf) 40 hours per week for three consecutive months.

- The disabilities are due to unrelated causes and you return to active full-time work for at least one day between disabilities.

- You return to work for at least 90 days if the successive periods of disability are due to accidental Injuries.

## Limitations

Weekly Income Benefits are not paid:

1.  If you are a disabled employee and are not under the care of a physician.

2.  If treatment resulting from an Injury did not occur within 14 days of the date of the Injury.

3.  For any disability due to work or pursuit of compensation or profit.

4.  For any disability for which benefits are payable under any workers' compensation, occupational disease, or similar law.

5.  For any disability for which you perform light-duty work.

6.  For any condition that does not meet the Plan's definition of total disability and cannot be verified by an examination by a physician designated by the Trustees.

7.  For any period you are drawing unemployment.

## Termination of Benefits

Benefit payments will end after 26 weeks or upon recovery from total disability, if earlier.

## Taxation of Weekly Income Benefits

As required by the Internal Revenue Service, weekly income benefits are subject to withholding for federal income tax purposes.

# Comprehensive Major Medical Benefits
## *Employees and Dependents*

## How the Plan Works

When you or your eligible dependent incurs Covered Medical Expenses due to a non-occupational Sickness or Injury that are in excess of the Deductible, the Comprehensive Major Medical Benefit reimburses you for a portion of the Covered Medical Expenses. Comprehensive Major Medical Benefits pay for a wide range of services and supplies. How the Plan works is simple. Each calendar year, Comprehensive Major Medical Benefits work like this:

- **Calendar Year Deductible:** You are responsible for meeting your calendar year Deductible (between January 1 and December 31) before the Plan begins to pay for Covered Medical Expenses. That means you or your dependent must pay the first $500 of Covered Medical Expenses before the Plan pays benefits. Once payments toward the $500 individual Deductible for your family reach the family maximum of $1,500, individual Deductibles for all family members will be met for the year. The amounts you pay toward the annual Deductible do not apply toward meeting the Plan's annual Out-of-Pocket Maximum.

- **Emergency Room Deductible:** If you or your dependents visit a hospital emergency room for treatment of a Sickness not due to an accident, you are required to pay an additional $50 Deductible for each visit after the first two visits in a calendar year. This Deductible is in addition to the calendar year Deductible and any other Coinsurance or Copayment amounts you are responsible for paying. In addition, this emergency room Deductible *does not* apply towards meeting your calendar year Deductible or Out-of-Pocket Maximum and you must pay this Deductible even after you have met your Out-of-Pocket Maximum.

- **Office Visit Copayment:** When you or a family member go to a physician's office, you pay a separate $10 Copayment for each office visit. This office visit Copayment is in addition to the calendar year Deductible and any other Coinsurance amounts you are responsible for paying. In addition, this office visit Copayment *does not* apply towards meeting your calendar year Deductible or Out-of-Pocket Maximum and you must pay this amount even after you have met your Out-of-Pocket Maximum. **Please note that you do not pay this $10 Copayment to your physician.** Once a claim is submitted, the Fund Office will deduct the $10 Copayment from the amount that the Fund reimburses you. Please also remember that if you have a Health Reimbursement Arrangement (HRA), you can use the funds in your account to pay for your office visit copayment. See page 57 for more information about how your HRA works.

- **Coinsurance:** Once you or your dependents meet the Deductible, the Plan pays a percentage of Covered Medical Expenses and you pay the rest. Benefits are paid based on Allowable Charges for the duration of an Injury or Sickness. The

Coinsurance percentage the Plan pays varies depending on whether you use a PPO or non-PPO provider. If you or your dependent use a:

- ***PPO provider,*** the Plan pays 90% of Allowable Charges, which requires you to pay the remaining 10% of Covered Medical Expenses, up to the Out-of-Pocket Maximum; or

- ***Non-PPO provider,*** the Plan pays 75% of Allowable Charges, which requires you to pay the remaining 25% of Covered Medical Expenses, up to the Out-of-Pocket Maximum.

The above Coinsurance percentages apply unless specifically noted otherwise.

- **Calendar Year Out-of-Pocket Maximum:** After you or your dependent have met the Deductible, then when Coinsurance, and Copayment amounts you pay for Covered Medical Expenses reach the calendar year Out-of-Pocket Maximum, the Plan pays 100% of Allowable Charges for most Covered Medical Expenses incurred for the remainder of that calendar year (January 1 – December 31). The calendar year Out-of-Pocket Maximum is $1,500 per person, up to a family maximum of $3,000. Generally, covered individuals will not pay more than $2,000 (including the Deductible) in a calendar year and an entire family will not pay more than $4,500 (including the Deductibles) in a calendar year.

  Please note that certain expenses are not subject to the Out-of-Pocket Maximum. This means amounts you pay for these expenses do not count towards meeting your Out-of-Pocket Maximum and you will continue to pay your Coinsurance percentage towards these expenses even after you reach your Out-of-Pocket Maximum. Expenses that are not subject to the Out-of-Pocket Maximum include:

  - Emergency room Deductible;
  - Office visit Copayment;
  - Chiropractic treatment; and
  - Organ transplant surgery performed at a non-Centers of Excellence Facility.

- **Annual Maximum:** The annual maximum for most Covered Medical Expenses is $2,000,000 per person. Effective January 21, 2014, there will be no annual maximum.

Note that some benefits and expenses may be covered differently or subject to benefit maximums. See the *Summary of Benefits* on page 4 and specific benefit descriptions for more information.

## Preferred Provider Organization

A Preferred Provider Organization (PPO) is a group of physicians and hospitals that have negotiated a contract with the Fund to provide discounts to members. Physicians and hospitals that participate in the PPO network are known as PPO providers. BlueCross BlueShield, the Plan's current PPO network, will answer your questions regarding whether your provider participates in their network. Call BlueCross BlueShield at

800-810-BLUE (2583) for a list of participating providers or use their Internet website (www.bcbs.com).

## Covered Medical Expenses

The Plan pays benefits, based on Allowable Charges, for the following Medically Necessary Covered Medical Expenses.

1. Hospital expenses, including pre-admission testing for diagnostic purposes, room and board up to the semi-private room rate and intensive care. Federal law requires that the Plan pay hospital expenses for any hospital length of stay in connection with childbirth for a mother and/or the newborn child for at least 48 hours (following a vaginal delivery) or at least 96 hours (following a cesarean section). However, federal law does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother and/or her newborn earlier than 48 hours (or 96 hours, if applicable) following delivery.

2. Miscellaneous hospital charges, including services in an operating room and services of an anesthesiologist, pathologist, or radiologist as well as emergency outpatient medical care (including surgical procedures and emergency first-aid treatment) if due to bodily Injury or Sickness,

3. Outpatient surgery for procedures performed in the outpatient department of a hospital, ambulatory medical-surgical facility, or other facility approved by the Trustees.

4. Charges made by an emergency professional ambulance service for transportation to the nearest hospital or physician's office equipped to provide the required treatment for a life threatening Injury or Sickness. In the case of a terminal illness, routine ground ambulance service to and from a physician's office will also be covered. Any other transportation services are not covered.

5. Surgical expenses, including physician, surgeon, and assistant surgeon fees, within limits, when performed in a physician's office or on an outpatient basis (at a hospital, hospital approved ambulatory medical-surgical facility or other facility approved by the Trustees). In addition, surgical expenses for reconstructive breast surgery and breast prosthesis following a mastectomy, including:
   - Reconstruction of the breast on which the mastectomy was performed;
   - Surgery and reconstruction of the other breast to produce a symmetrical appearance; and
   - Prostheses and treatment of physical complications at all stages of the mastectomy, including lymph edemas.

6. Doctor's services in the office or in the hospital.

7. Initial doctor's exam for newborn, well baby care in the hospital.

8.   Services of physiotherapists, speech therapists, registered nurses, nurse practitioners, legally licensed social workers, respiratory therapists (within guidelines), licensed practical nurses, nurse aides (when trained nurses are not available), provided the services are not rendered by an eligible person's relative by blood or marriage or by someone who ordinarily resides in the eligible person's home.

9.   Routine physical exams, including X-ray and laboratory testing (including pap smears) for employees and dependent spouses.

10.  Radiology (X-ray), nuclear medicines, and radiation therapy.

11.  Legend drugs and medicines requiring a prescription that are received during a hospital confinement and prescribed by the attending physician.

12.  Blood or blood plasma and its administration and storage related to surgery.

13.  Casts, splints, trusses, crutches, bandages, surgical dressings, oxygen, and rental of equipment for its administration.

14.  Durable medical equipment, within the limits of the Plan, that is Medically Necessary for the treatment of a Sickness or Injury. (For further information, you may view and obtain a copy of the Plan Document at the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org.) However, please note that orthotic devices are covered once every three calendar years and hearing aids are limited to $1,250 per ear once every five years for participants and dependents age 18 and over; there is no limit for dependents under age 18.

15.  Cardiac rehabilitation.

16.  Home health care, not to exceed 60 days. For further information, you may view and obtain a copy of the Plan Document at the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org.

17.  Hospice care in a freestanding facility or an approved method of treatment for a terminally ill patient, including services of a physician, home health care services, emotional support services, homemaker services, bereavement services, and medications.

18.  Well child care for routine office exams, inoculations, school physicals, athletic physicals, gynecological exams, and other kinds of well child care, as defined by the Plan.

19.  Charges for vasectomies or sterilization procedures performed on an employee or an employee's dependent spouse when performed in a physician's office. Inpatient vasectomies or sterilization procedures or outpatient procedures performed in an ambulatory medical-surgical facility, outpatient hospital setting, or similar setting are covered only when the attending physician certifies that the patient's health would be endangered if the procedure were performed in a physician's office.

Expenses incurred for reversals of such vasectomies or sterilization procedures are not covered.

20. Bone mass (bone density) measurement screening and repeat bone mass measurements when such tests are prescribed by the attending physician as Medically Necessary. Testing is covered once every two years, unless more frequent screening is Medically Necessary. Bone mass measurements by Dual Photon Absorptiometry (DPA) are not covered.

21. Colorectal cancer screening when recommended by a physician for an eligible person over age 50 once every 10 years, unless more frequent screening is Medically Necessary. Colorectal cancer screenings using molecular genetic techniques are not covered.

22. Testosterone replacement therapy, up to $2,500 per calendar year. However, to be considered a Covered Expense under the Plan, verification must be provided of the therapy's Medical Necessity from the attending physician, including lab results showing a testosterone deficiency. Testosterone replacement therapy must be FDA-approved for the diagnosis.

23. Negative Pressure Wound Therapy (NPWT), which is also referred to as wound vac therapy.

24. Cancer prevention exams, tuberculosis exams, sickle cell anemia exams, and other types of physical exams or tests used to determine whether a person has a specific Sickness or disease.

25. Physician, laboratory, and/or medication expenses for weight control or treatment of obesity, when the condition is acute, as measured by generally accepted medical standards.

26. Pediatrician or neonatologist professional services.

27. Genetic counseling, including charges for Chorionic Villi Sampling (CVS), when prescribed by the attending physician as Medically Necessary.

28. Infertility treatment; but, not for any means of artificial treatment, including but not limited to in-vitro fertilization, low tubule transfer, artificial insemination, embryo transfer, gamete transfer, zygote transfer, surrogate parenting, donor semen, sperm washing, reversal sterilization procedures, and any testing done to monitor these artificial means of stimulating pregnancy. In addition, charges for physician office visits and lab work are covered up to and just before any of the treatments described in the preceding sentence.

29. Second surgical opinions (or third opinions if the second opinion does not confirm the need for surgery) performed by a board certified specialist, including any Medically Necessary X-ray and laboratory examinations recommended by the physician providing the second opinion.

30. X-rays or laboratory examinations recommended by a physician in connection with the diagnosis of a non-occupational bodily Injury or Sickness.

31. Expenses due to a pregnancy or pregnancy-related conditions for female employees and spouses of male employees. Dependent pregnancy and related services are not a covered expense. Termination of pregnancy is covered only when the attending physician certifies that the female employee's or spouse's health would be endangered if the fetus was carried to term or that the child will be born with significant congenital deformities or defects, or that such termination is medically appropriate as a consequence of rape or incest.

32. Charges for the following additional services and supplies:

   a. Anesthesia and its administration.

   b. Artificial limbs and eyes to replace natural limbs and eyes lost.

   c. Other appliances to replace physical organs or parts. (For adults, only the initial charge for a prosthetic appliance will be covered. For children, charges for a replacement prosthetic device required due to growth will be covered).

   d. Dental services when provided by a physician or dentist for treatment within two years of an Injury to the jaw or sound natural teeth. If the Injury occurs to an eligible dependent who is under 18 years of age and it is determined that dental services to treat the Injury should be delayed until the eligible dependent reaches full growth, the two-year limit does not start until the eligible dependent reaches age 18. In order for the treatment to be covered by the Plan, the dependent must still be eligible under the rules of the Plan when the treatment begins.

   e. Temporomandibular Joint (TMJ) dysfunction syndrome treatment that is Medically Necessary, subject to the limitations listed in the *Summary of Benefits* on page 5.

33. Charges for routine foot care.

34. Acupuncture, subject to a 48-visit limit.

35. Bariatric surgery after Utilization Review by the large case manager if the participant meets industry standards for such surgery.

36. Private duty nursing only when the participant is in Hospice care.

37. Treatments for sleep apnea are covered when medically necessary and prescribed by a medical doctor. Note that charges for oral appliances and home sleep studies that are prescribed by a dentist to treat mild to moderate sleep apnea are not covered.

The following services are also covered under the Comprehensive Major Medical Benefits but with specific Coinsurance limitations and benefits maximums.

**Chiropractic Treatment:** Treatment from a chiropractor in connection with the detection, treatment, and correction of structural imbalance, subluxation, or misalignment of the vertebral column to alleviate pressure on spinal nerves, including X-ray and laboratory charges, is paid at 50% for up to 48 visits in a calendar year. Chiropractic charges, like all other charges are limited to the Allowable Charges. Expenses do not count towards the Out-of-Pocket Maximum.

**Temporomandibular Joint Dysfunction (TMJ) Treatment:** Treatment of TMJ for surgery, appliances, or adjustment is paid at 75% of the Allowable Charges up to a $2,000 per person lifetime maximum for participants and dependents age 18 and over; there is no lifetime maximum for dependents under age 18.

### Skilled Nursing Care/Skilled Nursing Facility or Subacute Care Facility

**Physical Therapy/Massage Therapy:** The Plan will cover up to 48 visits for physical therapy/massage therapy for patients age six or older. The Plan will cover unlimited physical therapy visits for patients under age six if the patient continues to make ongoing progress.

**Speech Therapy:** The Plan will cover up to 48 visits for speech therapy for patients age six or older. The Plan will cover unlimited speech therapy visits for patients under age six if the patient continues to make ongoing progress.

**Occupational Therapy:** The Plan will cover up to 48 visits for occupational therapy for patients age six or older. The Plan will cover unlimited physical occupational visits for patients under age six if they continue to make ongoing progress.

**Outpatient Psychological Counseling:** Family counseling is covered as Medically Necessary.

**Hearing Benefit Program**. The Fund, in partnership with EPIC Hearing Service Plan, assists active participants and pre-Medicare retirees* in locating hearing care professionals and, in most cases, reducing out-of-pocket expenses for hearing exams and hearing aid devices. Fund participants can save **approximately** 25-50% on major brand hearing instruments. In addition, EPIC has a discount program for hearing aid batteries— as a participant, you can have batteries shipped directly to your home, at a savings of over 40% from standard retail store pricing. To learn more, contact EPIC toll-free at 866-956-5400. Be sure to identify yourself or family members as participants in the NECA-IBEW Welfare Trust Fund.

Reminder: You can use the money in your HRA to pay for eligible hearing care expenses, including:

- Hearing aids, including hearing aid batteries.

- Special telephone equipment that lets a hearing-impaired person communicate over a regular telephone.

- Television equipment that displays the audio part of television programs, such as subtitles, for hearing-impaired persons.

* Medicare-eligible retirees can access the EPIC program, but benefit coverage is not provided by the Fund. Medicare-eligible retirees do not have hearing aid coverage.

**Meniscal Allograft Transplants:** A type of surgery in which a new meniscus (a cartilage ring in the knee) is placed into your knee is covered. This procedure is done in cases of meniscus tears that are so severe that all or nearly all of the meniscus cartilage has to be removed. The new meniscus can help eliminate knee pain and possibly prevent future arthritis. The Fund covers this type of surgery if you meet the following guidelines:

    a.      You are under the age of 55, and

    b.      Pre-operative studies (MRI or previous arthroscopy) reveal the absence or near-absence of the meniscus, and

    c.      Degenerative changes in the surrounding articular cartilage must be absent or minimal, and

    d.      Normal knee alignment and stability (i.e., intact or reconstructed ACL) or stability will be achieved concurrently with meniscal transplant.

### Behavioral Health Benefits

The Plan provides Behavioral Health Benefits, which include treatment and services for mental health disorders and substance abuse (which includes alcoholism, chemical dependency, and drug addiction) recommended by the attending physician or a behavioral health practitioner, up to the limits shown on the *Summary of Benefits* on page 6. Covered Expenses include the services of a physician, behavioral health practitioner, hospital, or other accredited treatment facility or recognized outpatient treatment program as determined by the Board of Trustees. Hospital expenses include room and board charges, medications, X-rays, lab/physician charges, and detoxification. Two days of partial hospitalization counts as one day of inpatient treatment.

### Organ Transplants

The Plan covers organ transplants. Pre-approval is required for Medical Necessity. Contact the Utilization Review Department immediately regarding organ transplants. Covered organ transplant surgeries are those defined as non-Experimental by the Centers for Medicare and Medicaid Services (CMS) for the condition being treated including, but not limited to, kidney, bone marrow, liver, heart, lung, heart/lung, pancreas, and pancreas/kidney. Organ procurement benefits are limited to a $20,000 maximum (payable at 100%, not subject to the Plan's Deductible but included as part of the Plan's annual maximum). The Plan's individual Deductible applies. If you use a Centers of Excellence

(COE) facility the Plan's Coinsurance and Out-of-Pocket Maximums apply. However, if a COE facility is not used, the Plan only pays 50% of the discounted charges, based on the negotiated COE fee and there is no Out-of-Pocket Maximum on the charges that you must pay.

**Extended Eligibility for Organ Donors.** The Fund will freeze your Hour Bank and grant 21 months of eligibility due to disability to all active members who donate an organ either to a family member or to another participant covered under the Welfare Trust Fund. (Family members include a spouse, child, sibling, parent, grandchild, or grandparent.)

### Immunosuppressive Medications

- **Retail Pharmacy Prescription Drug Program:** Immunosuppressive medications are only covered at a retail pharmacy if they are not available through the Mail-Order Prescription Drug Program. The Copayment is the same as under the Mail-Order Prescription Drug Program. For up to a 30-day supply, with no maximum, your Copayment is:
  - $25 per generic prescription;
  - $50 per brand name prescription; or
  - 10% coinsurance up to $300 per prescription for specialty medications. If you were receiving specialty medications prior to January 1, 2013, you will continue to pay the copayments listed above.

- **Mail-Order Prescription Drug Program**. For up to a 90-day supply of immunosuppressive medications, with no maximum, your Copayment is:
  - $25 per generic prescription;
  - $50 per brand name prescription; or
  - 10% coinsurance up to $300 per prescription for Specialty Medications. If you were receiving specialty medications prior to January 1, 2013, you will continue to pay the copayments listed above.

### Prescription Drugs

The Plan covers most prescription drugs under separate Prescription Drug Benefits, as described beginning on page 45.

## Medical Exclusions and Limitations

Medical Benefits do not pay for:

1. Dental work except as specifically provided otherwise by the Plan.
2. Eye refraction (for fitting of glasses only) or eyeglasses and charges for the fitting of eyeglasses. However, charges for eyeglasses and related fittings may be paid under the Plan's Vision Benefits.

3.  Dental prosthetic appliances and charges for the fittings of such appliances, except as otherwise covered under the Plan's Dental Benefits.

4.  Any expenses incurred for pre-natal testing, including amniocentesis, when done for the purpose of determining the sex of the child or without medical diagnosis.

5.  Equipment that does not significantly enhance the medical management of patient care.

6.  Equipment that is used solely as a patient comfort item.

7.  Supplies or equipment for personal hygiene, comfort, or convenience such as telephone, television, cosmetics, guest trays, magazines, or beds or cots for family members or other guests.

8.  Charges for a second surgical opinion from a physician affiliated with the physician rendering the first opinion.

9.  Expenses incurred for physical exams not performed by a doctor of medicine, for a physician exam received in connection with an Injury or Sickness, or for a pre-marital or pre-employment exam.

10. Growth hormones such as protropin, not to exceed $15,000 per year or $50,000 per lifetime within the guidelines established by the Trustees.

11. Expenses incurred for stand-by surgeons.

12. Expenses incurred relating to organ transplants:

    a.  Unless there is medical documentation that conventional treatment could be unsatisfactory, unavailable, and/or more hazardous than a transplant;

    b.  For any animal organ or mechanical equipment, device, or organ(s) except as otherwise specified by the Plan;

    c.  For any financial consideration to the donor other than for Covered Medical Expenses that are incurred in the performance of/or in relation to transplant surgery; and

    d.  That the patient may not be legally required to pay for.

13. Expenses incurred for a hospital confinement when the eligible person leaves the facility against the medical advice of the attending physician.

14. Any of the circumstances described in the Plan's general exclusions and limitations (see page 72).

15. Expenses related to sperm washing.

16. Weight loss programs.

17. Private duty nursing, except when the patient is in Hospice care.

## Extension of Medical Benefits

If you or your dependent no longer meet the Plan's eligibility requirements, your medical coverage will end. However, if you or your dependent is totally disabled (as defined by the Plan) when your eligibility ends, Comprehensive Major Medical Benefits may be continued for up to 12 months for expenses incurred for treatment of the disability that exists on your eligibility termination date. Benefits payable during the 12-month extension period are subject to a new Deductible and a new Out-of-Pocket Limit at the beginning of each Calendar Year. Only those charges related to treatment of the disability that existed on your termination date are eligible for Plan payment.

However, extended coverage will end sooner if you either recover from the disability or become covered under another Welfare Trust Fund or any other group plan. Coverage will end on that date or on the date you would become eligible under such other welfare or group plan but for the operation of the extension of benefits provisions of this Plan.

# Prescription Drug Benefits
## *Employees and Dependents*

Prescription Drug Benefits are available to all employees and their eligible dependents. The Plan's Prescription Drug Benefits are provided through Express Scripts. The Express Scripts Program includes a:

- Retail Pharmacy Prescription Drug Program;

- Mail-Order Prescription Drug Program; and

- Specialty Medication Program.

The Retail Pharmacy Prescription Drug Program includes a network of participating pharmacies, which includes most pharmacies, that have agreed to discounts for our members. For a free listing of participating pharmacies, Mail-Order Prescription Drug Program forms, and information regarding coverage for specific medications, contact through Express Scripts at the telephone number stated in the through Express Scripts information guide or through their website at www.express-scripts.com. For information about the Specialty Medication Program, visit www.accredo.com/Express-Scripts/.

## Prescription Drug Calendar Year Deductible

You and each of your family members must each pay the first $50 of expenses incurred for prescription drugs dispensed through either the Retail Pharmacy Prescription Drug Program or the Mail-Order Prescription Drug Program (or a combination of the two) each calendar year. This Deductible is separate from the Comprehensive Major Medical Benefits Deductible.

## Retail Pharmacy Program

Once you or your family member satisfies the prescription drug calendar year Deductible, you pay a Copayment for each prescription. When you have your prescription filled at a participating pharmacy, your Copayment is:

- $10 per generic prescription;

- $15 per brand name prescription;

- 10% coinsurance up to $300 per prescription for Specialty Medications. If you were receiving specialty medications prior to January 1, 2013, you will continue to pay the copayments above.

If you choose a brand name medication when a generic substitute is available, you are required to pay the $15 Copayment plus the difference in cost between the brand name and the generic substitute. The quantity of medication dispensed must be consistent with rational drug use, availability of product, and program economics, particularly for established drug regimens. You may obtain up to a 34-day supply through the Retail Pharmacy Prescription Drug Program.

Maintenance medications are those medications that are taken for an extended period to treat a chronic condition, such as diabetes, arthritis, or heart disease. The Retail Pharmacy Prescription Drug Program will honor your initial maintenance medication prescription and the first two refills. The third maintenance medication refill and all subsequent refills must be filled through the Mail-Order Prescription Drug Program to be covered under the Plan.

### Non-Participating Network Pharmacy

If you do not use a participating network retail pharmacy, you must file a prescription drug claim for reimbursement with the Welfare Trust Fund Administrative Office. Claims for prescriptions filled at a non-participating retail pharmacy will be reimbursed at 50%.

## Mail-Order Prescription Drug Program

Once you or your family member satisfies the prescription drug calendar year Deductible, you pay a Copayment for each prescription. When you have your prescription filled through the mail-order program, your Copayment is:

- $20 per generic prescription;

- $30 per preferred brand name prescription; or

- 10% coinsurance up to $300 per prescription for Specialty Medications. If you were receiving specialty medications prior to January 1, 2013, you will continue to pay the copayments above.

Again, if you choose a brand name drug when a generic drug substitute is available, you are required to pay the $30 Copayment plus the difference in cost between the brand name and the generic substitute. The quantity of medication dispensed must be consistent with rational drug use, availability of product, and program economics, particularly for established drug regiments. You may obtain up to a 90-day supply through the Mail-Order Prescription Drug Program.

**Maintenance Medications Reminder:** You must have the third maintenance medication refill and all subsequent maintenance medication refills filled though the Mail-Order Prescription Drug Program.

**Preferred Drug Step Therapy Program**. Some non-preferred medications are not covered by the Fund's prescription drug benefit unless you obtain approval through a coverage review. If you purchase a non-preferred medication, you will be responsible for the entire cost.

This requirement encourages you to try safer or more effective drugs before the Plan covers another drug. For example, if Drug A and Drug B treat the same medical condition, the Plan may require you to try Drug A first. If Drug A does not work for you and your doctor believes you should use a non-preferred medication, you or your doctor can request a coverage review by calling toll-free 800-417-1764. If, after review with your doctor, it is deemed appropriate, the Plan will then cover Drug B. This requirement

46

to try a different drug first is called "Step Therapy." For more information, visit Express Scripts online at www.express-scripts.com. You can also call Express Scripts toll-free at 800-711-0917.

**Specialty Medication Program.** The Plan provides a separate specialty medication cost share tier for its pharmacy benefit program. If you were receiving specialty medications prior to January 1, 2013, you will continue to receive those medications at the retail and mail order co-payment rates shown in the Summary of Benefits. If you begin receiving specialty medications on or after January 1, 2013, you will be subject to the specialty medication cost share amounts shown in the Summary of Benefits. Prior authorization may apply. Visit www.accredo.com/express-scripts/ for more information.

## Covered Medications

The following medications are covered when obtained through the Retail Pharmacy Prescription Drug Program or Mail-Order Prescription Drug Program:

- All federal legend medications;
- Insulin;
- Insulin syringes and needles;
- Compound medication containing at least one federal legend ingredient;
- Oral contraceptives;
- Diabetic diagnostics;
- Chantrix and other oral smoking cessation medications; and
- Erectile dysfunction medications (e.g. Viagra, etc.), limited to 10 pills per month.

## Exclusions

Prescription Drug Benefits do not pay for:

1.  Any type of device even if such devices require a prescription such as, but not limited to, contraceptive devices, therapeutic devices, and artificial appliances.

2.  Any charge for the administration or injection of any medication (other than insulin and other diabetic diagnostics).

3.  Any prescription for which an eligible individual is entitled to receive reimbursement under any workers' compensation law or is entitled to receive reimbursement of such prescription medication without charge from a municipality, state, or federal program, including Title XVIII of the Social Security Amendment of 1965.

4.  Any prescription filled in excess of the number specified by the physician or any refill after one year from the order of the physician.

5.  Medications dispensed by a hospital, skilled nursing facility, or subacute rehabilitation facility where the individual is confined.

6.  Any medication labeled "Caution-Limited by Federal Law to Investigational Use" or any Experimental or Investigational medication.

7.  Any Medication whose use is related to the restoration of fertility or the promotion of conception.

8.  Any medication that is not Medically Necessary.

9.  Fertility medications.

10. Hair loss products (e.g. topical Minoxidil, Rogaine, etc.).

11. Retin A, etc.

12. Over the counter medications, including smoking deterrents (such as Nicorette) and vitamins (whether prescribed or not).

13. Any of the circumstances described in the Plan's general exclusions and limitations (see page 72).

# Dental Benefits
## *Employees and Dependents*

The Fund has entered into an agreement with a Preferred Provider Dental Organization (PPDO). You and your dependent may choose dental treatment provided by network providers or non-network providers. Network providers have negotiated an agreement with the PPDO to discount prices.

## Covered Dental Expenses

The Plan pays a Coinsurance percentage of dental Covered Expenses up to the calendar year maximum for participants and dependents over age 18 (there is no maximum for dependents under age 18) as specified in the *Summary of Benefits* on page 7. Covered dental expenses include:

- Type I Dental Services:
  - Routine oral examinations and topical fluoride applications up to twice each calendar year;
  - Dental prophylaxis, including cleaning, scaling, and polishing, up to twice each calendar year;
  - Space maintainers for replacement of deciduous prematurely lost teeth for dependent children under age 19; and
  - Emergency palliative treatment.

- Type II Dental Services:
  - Full-mouth X-rays once in any period of 36 consecutive months;
  - Supplementary bitewing X-rays up to twice each calendar year;
  - Dental X-rays required in connection with the diagnosis of a specified condition requiring treatment;
  - Extractions and other oral surgery;
  - Restorative services using amalgam, synthetic porcelain, and plastic filling material;
  - General anesthetics when Medically Necessary and administered in connection with oral or dental surgery;
  - Periodontics for the treatment of gum diseases;
  - Endodontics, including pulpal therapy and root canal filling;
  - Injection of antibiotic drugs by the attending dentist;
  - Repair or cementing of crowns, inlays, onlays, bridgework, or dentures or relining or rebasing of dentures more than six months after the installation of an initial or replacement denture, but not more than one relining or rebasing in any period of 36 consecutive month period; and

- Onlays or crown restorations to restore diseased or broken teeth, but only when the tooth, as a result of extensive caries or fracture, cannot be restored with an amalgam, silicate, acrylic, synthetic porcelain, or composite filling restoration.

- Type III Dental Services:
  - Initial installation of fixed bridgework, including inlays and crowns as abutments;
  - Initial installation of partial or full removable dentures, including precision attachments and any adjustments during the six month period following installation;
  - Replacement of an existing partial or full removable denture or fixed bridgework by a new denture or by new bridgework or the addition of teeth to an existing partial, removable denture or to bridgework, but only if satisfactory evidence is presented that the:
    - Replacement or addition of teeth is required to replace one or more teeth extracted after the existing denture or bridgework was installed;
    - Existing denture or bridgework cannot be made serviceable and if at least five years have elapsed before its replacement and absent of unusual circumstances as determined by the Trustees in their sole discretion; or
    - Existing denture is an immediate temporary denture that cannot be made permanent and replacement by a permanent denture takes place within 12 months from the date of initial installation of the immediate temporary denture.
  - Charges for bridgework where bridgework only can adequately replace dentures; and
  - Charges for implantology.

- Type IV Dental Services: Orthodontia, 50% of the initial payment up to the lifetime maximum shown on the *Summary of Benefits* on page 7.

  - **Example 1:** You make a $5,400 initial payment for orthodontia services. The Fund would pay the maximum benefit of $2,000. Half (50%) of $5,400 is $2,700, which exceeds the $2,000 maximum benefit.

  - **Example 2:** You make an initial payment of $3,000 for orthodontia services, but the total cost is $5,400. The Fund would pay $1,500 (50% of $3,000). The remaining $2,400 would be divided by the number of months in the treatment plan. If the treatment plan is 24 months, you would be charged $100 per visit. The Fund would pay $50 for each visit until the remaining $500 of your $2,000 maximum benefit is exhausted. You must be eligible at the time of your initial visit to the orthodontist and in the following months in which services are rendered to receive payment for those services.

- Expenses incurred for an alternate method of treating a dental condition will be paid at the Allowable Charge for the service that is:

50

- Most commonly used nationwide in the treatment of that condition; and

- Recognized by the dental profession to be appropriate in accordance with accepted nationwide standards of dental practice.

Benefits are limited to the amount specified above. You are responsible for paying the difference in cost between the alternate method selected and the amount reimbursed.

## Dental Exclusions and Limitations

Dental Benefits are not paid for:

1. Any charge made for treatment by anyone other than a dentist, except that scaling or cleaning of teeth and topical fluoride application may be performed by a licensed dental hygienist if rendered under the supervision and guidance of a dentist.

2. Any charge for veneers or similar properties of crowns and pontics placed on or replacing teeth, other than the 10 upper and lower anterior teeth.

3. Any charge for services and supplies that are cosmetic in nature, including charges for personalization or characterization of dentures, bleaching, or for inlays without onlays.

4. Any charge for the replacement of a lost, missing, or stolen prosthetic device.

5. Any charge for any duplicate prosthetic device or other duplicate appliance.

6. Any charge for sealants, except Type II dental service sealants for dependent children under the age of 14 and for oral hygiene and dietary instruction.

7. Any charge for a plaque control program.

8. Any charge for services or supplies received because of dental disease, defect, or Injury due to war, declared or undeclared, or any act of war or aggression.

9. Any charge for dental care or services paid for, furnished by, or at the direction of any governmental agency, but only to the extent paid for or furnished.

10. Any dental expenses for which benefits may be payable under any other portion of this Plan.

11. Any charge for prosthetic devices, including bridges and crowns, and the fitting of such devices incurred before a Person is eligible for dental benefits.

12. Any charge for treatment started before the Person is eligible for dental benefits. Treatment is considered to begin for:

    a. Full or partial dentures, when the impression is taken for the appliance;

    b. Fixed bridgework, crowns, and other gold restorations, when the tooth is first prepared; or

    c. Root canal treatment, when the tooth is opened.

13. Diagnostic cast when done as part of routine checkup.

14. Any charge for services, treatment, or procedures that are considered Experimental in nature.

15. Any charge for the treatment of temporomandibular joint dysfunction (TMJ), except as specifically provided otherwise.

16. Any charge for oral appliances and home sleep studies that are prescribed by a dentist to treat mild to moderate sleep apnea. Note that treatments for sleep apnea are covered when medically necessary and prescribed by a medical doctor.

17. Any of the circumstances described in the Plan's general exclusions and limitations (see page 72).

Charges exceeding the Plan's Dental Benefits **may not** be used to satisfy the Deductible under other provisions of the Plan.

## Extension of Dental Benefits

There is limited extension of coverage if you or a dependent is totally disabled on the date your eligibility would otherwise end.

Benefits are extended under the Dental Benefit for a period of three months for dental expenses incurred for:

- Bridgework, crowns, or gold restorations, provided the tooth was prepared while you were eligible;

- Full or partial dentures, provided the impression for the appliance was taken while you were eligible;

- Endodontic treatment, provided the tooth was opened for root canal therapy while you were eligible;

- Injury to natural teeth if you were eligible at the time of the Injury.

This extension of dental benefits will end on the earliest of the 91st day following the date your dental benefits terminate under the regular plan, the date you become covered under another group welfare plan, or the date you become eligible for coverage under another group welfare plan.

# Vision Benefits
## *Employees and Dependents*

The Plan pays 100% of vision Covered Expenses up to the calendar year maximum for participants and dependents over age 18 (there is no maximum for dependents under age 18) listed in the *Summary of Benefits* on page 8. You may go to any qualified ophthalmologist, optometrist, or optician to receive covered vision services and/or materials related to vision correction. You will need to pay the provider at the time you receive the services or materials and then submit an itemized bill and proof of payment to the Welfare Trust Fund Administrative Office for reimbursement. Since the Plan only pays up to a calendar year maximum, this amount may not be sufficient to pay for the entire cost of the eye examination and/or materials, so be sure to use your benefits wisely.

## Covered Vision Expenses

You are eligible to receive covered vision care services up to the calendar year (January 1 – December 31) maximum, as provided in the Summary of Benefits. Covered vision expenses include:

- Complete eye examination, including dilation of pupil and/or relaxing of focusing muscles by drops and refraction for vision by a legally qualified ophthalmologist or optometrist; and

- New or replacement frames and lenses, *or* a one-year supply of contact lenses prescribed by an ophthalmologist, optometrist, or optician, including fitting.

All expenses are considered to be incurred on the date on which the services that gave rise to the expense are rendered/performed.

## Vision Exclusions

Vision benefits are not paid for:

1. Vision care treatment incurred before the date the person became eligible under this Plan.

2. Services or supplies that are covered in whole or in part under any other portion of this Plan.

3. Special procedures, such as orthoptics, vision training, or special supplies such as non-prescription sunglasses or subnormal vision aids.

4. Services or supplies not listed as covered vision expenses.

5. Plano lenses (non-prescription).

6. Medical or surgical treatment of the eyes that requires the services of a physician.

7. Non-prescription items.

8.  Services and/or materials covered under any workers' compensation or governmental program.

9.  Eye examinations required for employment.

10. Contact lenses required after cataract surgery; however these lenses may be covered under the Plan's Comprehensive Major Medical Benefits.

11. Any of the circumstances described in the Plan's general exclusions and limitations (on page 72).

Charges exceeding the Plan's Vision Benefits **may not** be used to satisfy the Deductible under other provisions of the Plan.

# Wellness Power: Wellness and Disease Management Benefits

The Fund provides Wellness and Disease Management Benefits for eligible participants and dependents. Wellness and Disease Management Benefits include health tools and access to healthcare professionals to provide health advice and assistance. All NECA-IBEW Welfare Trust Fund participants, including Retirees over age 65 and eligible dependents over age 18, can participate in these programs. Dependents under age 18 with diabetes and asthma can also participate in certain components of the program. Retirees over age 65, their spouses, and all covered dependent children are not eligible to earn HRA rewards.

To learn more about your Wellness and Disease Management Benefits, contact the Welfare Trust Fund Administrative Office.

The Wellness Coaching, NurseLine and Disease Management programs are administered by Nurtur.

## Health Risk Assessment

A Health Risk Assessment is a confidential questionnaire designed by healthcare experts to help you evaluate your health and identify potential health risks before they become serious health problems. Once you complete the confidential questionnaire, healthcare professionals will review your answers and, if applicable, provide you with recommendations on how to enhance your health and wellbeing, so you can seek proper care and make necessary lifestyle changes.

The results of the Health Risk Assessment are confidential and are available only to you. Results are not available to the Fund Office, your employer, or your union. Your Health Risk Assessment will not affect your eligibility or benefit payments. You can complete the assessment online or on paper.

All of your personal health information is completely confidential. The Fund's Wellness and Disease Management program meets all federal and state regulations, including those that are part of the HIPAA privacy regulations.

## Wellness Programs

Retirees and eligible dependents also have access to health improvement programs including interactive tools, resources, information, and online lessons, as well as access to healthcare professionals to help you achieve and maintain a healthy, balanced lifestyle. The Wellness Programs offered include weight loss, smoking cessation, exercise, stress relief, diabetes, heart health, and nutrition programs.

## NurseLine

Participants, covered spouses, retirees and eligible dependents have access to a 24-hour NurseLine. Just call 877-941-1692 to speak with a registered nurse any time you need health advice or assistance. The NurseLine can help you to:

- Determine when to call 911 or emergency services;

- Find nearby doctors and hospitals—anywhere in the country;

- Deal with minor health issues yourself;

- Better understand your symptoms and treatment options; or

- Make the most of your medications by learning about cost-saving options and how to avoid drug interactions.

## Health Reference and Video Library

Nurtur's Health Reference Library contains over 3,900 articles for your information, as well as a Multimedia Encyclopedia, Spanish Encyclopedia, Care Guide, Wellness Tools and various health assessments. In addition, the video health library contains over 800 health and wellness videos.

## Disease Management Programs

The Disease Management programs are designed to help you manage chronic conditions—Diabetes, Coronary Artery Disease, Heart Failure, Asthma, and Chronic Obstructive Pulmonary Disease—and reduce the risk of complications. If you have one or more of these chronic conditions, a healthcare professional will contact you to discuss the benefits of participating in a Disease Management program and help you learn about ways to modify your lifestyle for better health. They will also monitor your progress and work with you and your physician to make sure your treatment is appropriate.

## Earning Health Reimbursement Arrangement Rewards

Participants, covered spouses, retirees under age 65 and their covered spouses are eligible to receive rewards for participating in the Wellness and Disease Management programs. When you or your spouse enroll and comply with the requirements of the programs, you will receive a reward in the form of a contribution to your Health Reimbursement Arrangement. To find out the current reward levels, please contact the Welfare Trust Fund Administrative Office at 800-765-4239. The Trustees reserve the right to modify the reward structure at any time. You can use your rewards to pay for healthcare expenses as defined by Internal Revenue Code (IRC) Section 213, including medical expenses and prescription medications that are not covered by the Fund. The Health Reimbursement Arrangement (HRA) program is described starting on page 57.

# Health Reimbursement Arrangement (HRA)

The Plan includes a Health Reimbursement Arrangement (HRA). When eligible, the Plan sets up and maintains an account for eligible employees to use for reimbursement of eligible health care expenses, on a tax-free basis.

## HRA Eligibility

You are eligible to participate if you work under a collective bargaining agreement that allows for contributions to an HRA on your behalf. For non-bargained employees, there must be a written participation agreement allowing for contributions on your behalf.

While contributions are only made on your behalf while you are working for a participating employer, you do not have to be an active participant to use the money in your HRA. This allows you to use your HRA for reimbursement of future expenses, such as the cost of continued coverage when you are not working enough hours or after retirement (if you are eligible for retiree coverage). In addition, your HRA balance is available to your surviving spouse and dependent children in the event of your death, provided they were covered as dependents under the Plan.

You continue to be eligible to use your HRA for reimbursement of eligible health care expenses for three years from the date work hours were last reported (that is, when you left covered employment; this does not apply to retirement). In the event of your death, your surviving spouse will continue to be eligible for reimbursement of eligible expenses until the earliest of:

- The date your HRA account balance reaches zero;

- The date your HRA terminates; or

- If your HRA account is inactive for 36 months and your HRA account balance is $500 or less, then your HRA account will be terminated and your account balance will be forfeited on the first day of the month following the 36-month period of inactivity.

If you go on a qualifying leave under FMLA or USERRA, the Fund will continue to maintain your benefits on the same terms and conditions as if you were still an Active Employee.

## Establishing an HRA Account

When you work for a participating employer, an HRA contribution will be made on your behalf and credited to your HRA for each hour that you work. In other words, the more hours you work, the more contributions are made to your HRA. Please note that only employer HRA contributions made on your behalf are credited to your HRA; you may **not** make contributions to your account.

Once the Fund establishes your account, you may submit claims for eligible health care expenses incurred by you, your spouse, and/or your dependents. In no event will benefits be provided in the form of cash or any other taxable or non-taxable benefit other than reimbursement for eligible expenses. Payments will only be made to you, or your beneficiary in the event of your death. There is no assignment of benefits to providers and no benefit payments may be paid to providers.

## Your HRA Balance

Your HRA balance is the total of employer contributions made on your behalf for the HRA, minus a 5% administrative fee on each employer contribution, plus any interest earned, minus any reimbursements you request from your HRA. The amount available for reimbursement of eligible expenses is the amount credited to your HRA. Contributions made on your behalf will not be credited to your HRA until after they are received by the Fund, but always within 30 days after they are received. In other words, there may be a lag between the time contributions are required on your behalf and when they are available for you to use. Keep in mind that any unused amounts in your HRA at the end of a calendar year are carried over into the next year.

Unused balances remaining in your HRA at the end of a calendar year roll over into the next year, even into retirement. This allows you to save for future health expenses. Once you are no longer eligible for Plan coverage, your HRA may be carried forward for up to three years after your Plan coverage ends (for reasons other than retirement). Keep in mind, however, that no further employer contributions will be made to your account once you terminate covered employment. Your HRA balance will be carried forward until no balance remains or until three years after you are no longer covered under the Plan. During the three-year period, you may continue to use the money in your HRA for reimbursement of eligible health care expenses as long as a balance remains in your account.

In the event of your death, your surviving spouse continues to be entitled to reimbursements from your HRA account until the earlier of the date your HRA account reaches a zero balance, the HRA ends, or if the HRA account is inactive for 36 months and the HRA balance is $500 or less. Your other dependents covered under the HRA may continue participation in the HRA until the earlier of the date they no longer meet the Plan's definition of dependent, the date your HRA account reaches a zero balance, or the HRA ends. If you do not have any dependents, any amounts left in your HRA account will not be paid to any other individual. In this instance, all amounts remaining are forfeited and revert to the Plan to be used for administrative expenses. In no event will remaining assets be paid in cash to any person.

Your HRA account may be terminated for inactivity. If your HRA account is inactive for 36 months and your HRA account balance is $500 or less, then your HRA account will be terminated and your account balance will be forfeited on the first day of the month following the 36-month period of inactivity.

## Reimbursable Expenses

You can use the money in your HRA to pay for eligible health care expenses incurred by you, your spouse and/or your eligible dependents. Please note that as with any Plan coverage, your spouse and/or your other dependents must meet the Plan's definition of dependent for their expenses to be eligible for reimbursement. Any reimbursements you submit for your spouse's and/or your dependents' expenses will be charged against your HRA.

In general, health care expenses eligible for reimbursement include, but are not limited to:

- Hospital, doctor, and dentist bills, and prescription drugs;

- Amounts you pay for deductibles, copayments, and coinsurance;

- Premiums for group health plan coverage (provided premiums are not paid through salary reduction contributions under the terms of a Code Section 125 plan or any plan that provides for premium payment with pre-tax dollars), COBRA Continuation Coverage, and Medicare Parts B, C, and D.

Following is a partial listing of the type of expenses that may be eligible for reimbursement from the Fund's HRA Plan. This list is based on IRC Section 213 and is taken from the Department of Treasury, Internal Revenue Service, *Publication 502, Medical and Dental Expenses*. Please note that not all IRC Section 213 expenses are eligible for reimbursement. For more detailed information, contact the IRS or visit www.irs.gov/pub/irs-pdf/p502.pdf.

- Acupuncture
- Alcoholism, including inpatient treatment at a therapeutic center for alcohol addiction, including meals and lodging provided by the center during treatment.
- Artificial limbs.
- Artificial teeth, for other than cosmetic reasons.
- Birth control pills prescribed by a doctor.
- Breast reconstruction surgery following a mastectomy for cancer.
- Chiropractor.
- Contact lenses needed for medical reasons, including cost of equipment and materials required for using contact lenses, such as saline solution and enzyme cleaner.
- Crutches (rental or purchase).
- Dental treatment, including fees paid to dentists for X-rays, fillings, braces, extractions, dentures, etc. (but *Teeth Whitening*, as described later, are not covered).

59

- Diagnostic devices used in diagnosing and treating illness and disease.

- Drug addiction for inpatient treatment at a therapeutic center for drug addiction, including meals and lodging at the center during treatment.

- Eye or vision correction surgery, including eye surgery to treat defective vision, such as laser eye surgery or radial keratotomy.

- Eyeglasses needed for medical reasons, including fees paid for eye examinations.

- Fertility enhancement to overcome an inability to have children, including:

- Procedures, such as *in vitro* fertilization and temporary storage of eggs or sperm.

- Surgery, including an operation to reverse prior surgery that prevented the person from having children.

- Health institute if the treatment is prescribed by a physician and the physician issues a statement that the treatment is necessary to alleviate a physical or mental defect or illness of the individual receiving the treatment.

- Hearing aids including batteries to operate it.

- Home Care (see *Nursing services*).

- Hospital services for inpatient care at a hospital or similar institution if a principal reason for being there is to receive medical care; this includes meals and lodging (see *Lodging*).

- Laboratory fees for medical care.

- Legal abortion.

- Legal medical services provided by physicians, surgeons, specialists, and other medical practitioners.

- Lodging at a hospital or similar institution while away from home if:

  - The lodging is primarily for and essential to medical care;

  - The medical care is provided by a doctor in a licensed hospital or in a medical care facility related to or the equivalent of, a licensed hospital;

  - The lodging is not lavish or extravagant under the circumstances; and

  - There is no significant element of personal pleasure, recreation, or vacation in the travel away from home.

Amounts for lodging cannot be more than $50 for each night for the individual receiving medical care and a person traveling with that individual. Expenses are not eligible if treatment is not received from a doctor in a licensed hospital or in a medical

care facility related to, or the equivalent of, a licensed hospital or if the lodging is not primarily for or essential to the medical care received.

- Medical supplies, such as bandages used to cover torn skin.

- Medicines that require a prescription by a doctor for use by an individual, including insulin.

- Mentally retarded special home, which includes the cost of keeping a mentally retarded person in a special home, not the home of a relative, on the recommendation of a psychiatrist to help the person adjust from life in a mental hospital to community living.

- Nursing home medical care (including care in a home for the aged or similar institution), meals, and lodging if a principal reason for being there is to get medical care.

- Nursing services, including wages and other amounts paid for nursing services provided by a nurse licensed in the jurisdiction where providing services.

- Operations or surgery, when legal and not performed for unnecessary cosmetic surgery (see *Cosmetic surgery*).

- Optometrist.

- Organ donors (see *Transplants*).

- Osteopath.

- Oxygen, including equipment, to relieve breathing problems caused by a medical condition.

- Prosthesis.

- Psychiatric care, including the cost of supporting a mentally ill dependent at a specially equipped medical center where the dependent receives medical care.

- Psychoanalysis (however, psychoanalysis that is part of required training to be a psychoanalyst is not eligible).

- Psychologist.

- Sterilization (a legally performed operation to make a person unable to have children).

- Stop-smoking programs (this does not include stop-smoking drugs that do not require a prescription, such as nicotine gum or patches).

- Telephone special equipment that lets a hearing-impaired person communicate over a regular telephone, including teletypewriter (TTY) and telecommunications device for the deaf (TDD) equipment as well as equipment repair costs.

- Television equipment that displays the audio part of television programs, such as subtitles, for hearing-impaired persons (this is an adapter that attaches to a regular set or some of the costs associated with a specially equipped television that exceeds the cost of the same model regular television set).

- Therapy received as medical treatment (not including massage therapy).

- Transplants as a donor or possible donor of an organ.

- Vasectomy.

- Wheelchair used mainly for the relief of sickness or disability, and not just to provide transportation to and from work; this includes the cost of operating and maintaining the wheelchair.

- Wig purchased upon the advice of a physician for the mental health of a patient who has lost all hair from disease.

- X-rays for medical reasons.

## Expenses Not Eligible for Reimbursement

Expenses that are not eligible for reimbursement from the HRA (as defined by Section 213(d) of the Internal Revenue Code) include, but are not limited to:

- Long-term care services.

- Cosmetic or reconstructive surgery or other similar procedures, unless the surgery or procedure is necessary to ameliorate a deformity arising from, or directly related to, a congenital abnormality, personal injury resulting from an accident or trauma, or disfiguring disease.

- The salary expense of a nurse to care for a healthy newborn at home.

- Funeral and burial expenses.

- Household and domestic help (even though recommended by a qualified physician due to you or your dependent's inability to perform physical housework).

- Massage therapy.

- Home or automobile improvements.

- Custodial care.

- Costs for sending a problem child to a special school for benefits that the child may receive from the course of study and disciplinary methods.

- Health club or fitness program dues, even if the program is necessary to alleviate a specific medical condition, such as obesity.

- Social activities, such as dance lessons (even though recommended by a physician for general health improvement).

- Bottled water.

- Maternity clothes.

- Diaper service or diapers.

- Cosmetics, toiletries, toothpaste, etc.

- Vitamins and food supplements, even if prescribed by a physician.

- Uniforms or special clothing, such as maternity clothing.

- Automobile insurance premiums.

- Transportation expenses of any sort, including transportation expenses to receive medical care.

- Marijuana and other controlled substances that are in violation of federal laws, even if prescribed by a physician.

- Any item that does not constitute "medical care" as defined under Code Section 213.

- Premiums paid through salary reduction contributions under the terms of a Code Section 125 plan.

- Medical care expenses that you or your dependents are reimbursed or reimbursable for through another health insurance plan, other insurance, or any other accident or health plan. However, if only a portion of a medical care expenses has been reimbursed elsewhere (e.g., because another health insurance plan imposes copayment or deductible limitations), the HRA Account can reimburse the remaining portion if it otherwise meets the requirements.

## Claim and Reimbursement Procedures

You must submit a claim for reimbursement of any eligible expense. If you, your spouse, and/or your dependents are eligible for other coverage, you must include a copy of the Explanation of Benefits (EOB) from the other coverage as well as any EOB from this Plan. Only eligible expenses that have not been reimbursed, as shown on the EOB form, will be considered eligible for reimbursement.

You may submit eligible expenses for reimbursement at any time. While requests for reimbursement can be made at any time, to limit administrative expenses, **the Plan requires that any requests for reimbursement be for a minimum of $50.** Therefore, you will have to hold your requests for reimbursement until you have at least $50 in eligible expenses. In addition, the amount reimbursed for any eligible expense will not exceed your HRA balance at the time reimbursement is requested. However, in the event your

Plan coverage ends, you may submit eligible expenses totaling less than $50 to close out your HRA.

To receive reimbursement for eligible expenses, you must submit a written claim form within 12 months of the date the expense was incurred and in accordance with the Plan's claim procedures. If you fail to do so, your claim may be denied. In addition, any HRA payments that are unclaimed (e.g., uncashed checks) by the end of the year following the year in which the claim was incurred, will remain the property of the Fund.

Reimbursement applications must be accompanied by a signed statement verifying that the eligible expenses:

- Have not been otherwise reimbursed, nor will they otherwise be reimbursed, through any other source (including an Health Care FSA, if applicable);
- For premiums paid for other coverage, have not been paid or are not eligible for payment on a pre-tax basis; and
- Have not been taken, nor intend to be taken, as a tax deduction.

Along with the form, you must provide any of the following, as applicable:

- An itemized bill from the service provider that includes the name of the person incurring the charges, date of service, description of services, name of provider, and amount of charge.
- An Explanation of Benefits (EOB) from any coverage (including any EOB from this Plan) when requesting reimbursement of the balance of charges for which coverage is available plus original receipts verifying payment.
- Proof of the amount and date paid when requesting reimbursement for other insurance premiums, such as a spouse's group health coverage premiums and verification that the premium was not paid or eligible for payment under an IRC Section 125 plan. Additional documentation is also required for reimbursement of premiums under a qualified long-term care contract.
- A receipt and proof of purchase or rental for covered items (such as for crutches or wheelchairs).
- An acceptable proof of payment such as a copy of the front and back of a cancelled check or a copy of the front of a check along with the corresponding bank statement, credit card statement or itemized sales receipt.
- Any additional documentation requested by the Plan.

HRA benefits are intended to pay benefits only for medical care expenses not previously reimbursed or reimbursable elsewhere. If a medical care expense is payable or reimbursable from another source, that other source will pay or reimburse before payment or reimbursement from the HRA. However, if the eligible expense is covered by both the HRA and by a health care Flexible Spending Account (FSA), then the HRA is not available for reimbursement of that expense until after amounts available for reimbursement under the FSA have been exhausted.

## Claim Submission

Please mail your completed claim form and any required documentation to:

NECA-IBEW Welfare Trust Fund
Attn: HRA Dept.
2120 Hubbard Avenue
Decatur, IL 62526-2871.

**Note:** The HRA is intended to qualify as a medical reimbursement plan under Code Sections 105 and 106 and associated regulations and as a health reimbursement arrangement as defined under IRS Notice 2002-45. Reimbursements under the HRA are intended to be eligible for exclusion from your gross income under Code Section 105(b).

# Other Plan Features

## Coordination of Benefits

If you or your dependents are covered by another health (medical, prescription drug, dental, and/or vision) plan, the combined benefits paid to you may not exceed 100% of the charges. If you or a dependent are covered by another plan, you must **submit** your claim to both plans. You will receive payment (if appropriate) from our Plan showing how your claim was calculated.

The amount charged by a health care provider to the other plan for an item of health expense will be considered as the amount the health care provider will accept as payment in full of the item of expense. If such amount charged to the other plan differs from the charge reported to the Plan, allowable expenses for the item of health expense will not exceed the smaller of the charges.

Group plans determine the sequence in which they pay benefits, or which plan pays first, by applying a uniform order of benefit determination rules in a specific sequence. The following four rules override any other plan rules:

- If the other plan does not have a coordination of benefits provision, that plan will be the primary plan and will pay benefits first.

- If your spouse is offered any comprehensive major medical coverage though their employer, your spouse must accept the coverage. This includes spouses of retired and active participants that work full-time or part-time. If your spouse does not accept such other coverage, he or she will not be covered under this Plan.

- No coverage of any kind will be provided by this Plan to a dependent who has, or has available, any kind of medical coverage from his or her employer's plan unless that dependent's employer plan provides the same maximum benefits to all its employees regardless of the coverage the employee (or the employee's dependents) may have in another plan.

- If an eligible dependent has primary coverage under a Health Maintenance Organization (HMO), Exclusive Provider Organization (EPO), Preferred Provider Organization (PPO), or any other managed care program and voluntarily elects not to use the facilities or services of the HMO, EPO, or PPO, no benefits will be paid from this Plan. This rule also applies to dependent children whose coverage would be primary under the HMO, EPO, or PPO.

"Other plan" means any plan providing benefits or services for or by reason of medical, dental, or vision care or treatment for which benefits or services are provided by:

- Group blanket or franchise insurance coverage;

- Group BlueCross BlueShield coverage and other prepayment coverage;

- Any coverage under labor-management trusteed plans, union welfare plans, employer organization plans, employee benefits organization plans, or any other arrangement of benefits for individuals or a group; or

- Any coverage under governmental programs, other than Medicaid, and any coverage required or provided by any statute.

"Other Plan" also includes this Plan when an individual is covered as both an Employee and a dependent, and when a child is covered as a dependent of more than one Employee.

Our Plan will work with your other plan to coordinate your benefits based on our Plan. If the rules above do not apply to the situation, the first of the following rules that apply will establish the order:

- *Non-dependent/dependent.* The plan that covers a person as an employee, retiree, member, or subscriber (other than as a dependent) is primary and pays benefits first. (Except if the person is also a Medicare beneficiary and Medicare is secondary then the order of benefits is reversed).

- *Dependent child covered under more than one plan when the parents are married, not separated (whether or not they have ever been married), or a court decree awards joint custody (without specifying that responsibility for the child's health care coverage):*

  - The plan that covers the parent whose birthday falls earlier in the calendar year is primary and pays first.

  - If both parents have the same birthday, the plan that has covered one of the parents for a longer period is primary and pays first and the plan that has covered the other parent for the shorter period pays second.

  - If a court decree does not specify that one parent is responsible for the child's health care expenses or health care coverage, and the plan of that parent has actual knowledge of the terms of that court decree, that plan is primary and pays first. If the parent with financial responsibility has no coverage for the child, but that parent's current spouse does, the plan of the spouse of the parent with financial responsibility is primary and pays first. However, this does not apply during any Plan year during which any benefits were actually paid or provided before the Plan had actual knowledge of the specific terms of that court decree.

- *Dependent child covered under more than one plan when the parents are not married, are separated (whether or not they ever were married), or are divorced and there is no court decree specifying responsibility for the child's health care coverage:*

  - The plan of the custodial parent is primary and pays first;

  - The plan of the custodial parent's spouse (if any) pays second;

  - The plan of the non-custodial parent pays third; and

  - The plan of the non-custodial parent's spouse (if any) pays last.

- *Dependent child covered under more than one plan when the parents are not married, are separated (whether or not they ever were married) or divorced and there is a court decree specifying responsibility for the child's health care coverage;*
  - The plan of the specified parent is primary and pays first;
  - The plan of the custodial parent pays second; and
  - The plan of the custodial parent's spouse pays last.

  *Exception:* If the specified parent fails to provide the coverage mandated in the court decree, the custodial parent has no coverage and the custodial parent signs a "deadbeat parent" agreement. This Fund will pay the dependent claims at 50%. Scheduled Deductibles, Out-of-Pocket Maximums and Copayments apply.

- *Active/laid-off or retired employee.* The plan that covers a person either as an Active Employee (who is neither laid-off nor retired) or as that Active Employee's dependent is primary and pays first. If the other plan does not have this rule regarding active/laid-off or retired employee, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored. If a person is covered as a laid-off or retired employee under one plan and as a dependent of an Active Employee under another plan, the order of benefits is determined by the dependent/non-dependent rule rather than by this rule.

- *Continuation Coverage.* If a person whose coverage is provided under a right of continuation under federal or state law is also covered under another plan, the plan that covers the person as an employee, retiree, member, or subscriber (or as that person's dependent) is primary and pays first. If the other plan does not have this continuation coverage rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored. If a person is covered other than as a dependent (that is, as an employee, former employee, retiree, member, or subscriber) under a right of continuation coverage under federal or state law under one plan and as a dependent of an Active Employee under another plan, the order of benefits is determined by the dependent/non-dependent rule rather than by this rule.

- *Length of Coverage.* If none of the previous rules determines the order of benefits, the plan that covered the person for the longer period is primary and pays first.

### Coordination with Medicare

Active employees and/or their eligible dependents who are also covered by Medicare will be covered by the Plan with this Plan paying benefits first and then Medicare will determine what benefits it will pay of the remaining expense not covered by the Fund.

If you have questions regarding the Plan's rules for coordinating benefits, call the Welfare Trust Fund Administrative Office. You will be furnished an explanation of the rules. You may request a written copy of the coordination of benefits rules.

## Reimbursement, Subrogation, and Loan Agreements

The Plan can recover the amount of benefits it pays on your behalf for covered weekly income, medical, prescription drug, dental, and vision benefits resulting from an Injury or Sickness for which someone else (a third party) is legally responsible and required to pay. For example, treatment received because of a car accident, removal of breast implants, or when the court requires a parent to be financially responsible for providing health care benefits and this Plan pays because the parent is not fulfilling their responsibility. If this occurs, the Plan has special processing procedures for handling your claim, including completing subrogation and loan agreements. The Fund's right to reimbursement and subrogation is more fully explained in the Plan Document available from the Welfare Trust Fund Administrative Office or online at www.neca-ibew.org.

Please note that any Injury, Sickness, dental, or vision treatment that arises out of or in the course of any occupation or employment for wage or profit is not a Covered Expense and is not subject to this subrogation provision.

The following section describes the rules that apply should another source, such as an automobile insurance company, be responsible for medical expenses that have already been reimbursed by the Plan. This may happen, for example, if you are in an automobile accident and receive medical treatment as a result. In the case of claims involving third-party liability, the Plan will pay benefits under the following conditions:

1. You and your dependents (and your attorney if you have one) must provide the Plan with written subrogation documents or loan agreements in which you and your dependents agree to repay the Plan the amount of benefits the Plan pays on a claim out of any recovery of expenses you receive. The Plan will not expect repayment of more than the benefits it pays on a claim or more than the amount you or your dependents receive. The Plan has the right, subject to written waiver by the Fund, to recover 100% of the amounts paid to your or your covered dependents' medical providers.

2. If you or your dependents receive payment from the responsible party and do not repay the Plan, the Plan has the right to withhold any future benefits to which you or your dependents may become entitled, based on claims for treatment received, until the proper amount has been repaid.

3. You and your dependents must sign an agreement not to assign any other person the right to recover the amount of the expense.

4. If a claim is for a minor child, the child's parent or guardian must sign the required documents on behalf of the child, including, but not limited to, the Subrogation Agreement.

5. If the responsible third party does not voluntarily pay for expenses and you or your dependents do not file suit against the party to recover expenses, you and your dependents must provide the Plan with a written agreement giving the Plan the right to file suit in your or your dependents' name to recover expenses the Plan paid on the claim. In the event the Plan files suit and makes a recovery, the Plan's

expenses, costs and attorney's fees will be paid out of the recovery settlement. In the event you or your dependents file suit and make a recovery, the Plan will not be liable for any expenses incurred or attorneys' fees arising out of the litigation or recovery unless written authority from the Plan is first obtained.

6.     If you or your dependents provide proof that is acceptable to the Trustees that you or your dependents have not received any recovery from a third party and that there is no possibility of any recovery, the Plan will pay Covered Expenses, but only after the subrogation documents or loan agreements are signed according to Plan procedures.

7.     If you or your dependents receive any recovery, by way of judgment, settlement or for any other reason, from any other person or business entity, you and/or your dependents agree to hold such recovery in a constructive trust for the Plan and to reimburse the Plan in full, for any medical or Disability expenses paid by the Plan.

8.     The Plan's right to full recovery, either by way of subrogation or right of reimbursement, may be from funds you, your dependents or guardian receives or is entitled to receive from the third party, any liability or other insurance covering the third party, the insured's own uninsured motorist insurance, underinsured motorists insurance, any medical payments, no-fault or school insurance coverage that are paid or payable.

9.     The Plan's right to recovery survives your death or the death of your dependent and beneficiary and will automatically bind the decedent's successors, assignees, executor or estate.

Acceptance of benefits under this Plan indicates acceptance of these terms and conditions.

## Recovery of Overpayments and Erroneous Payments

If the Plan makes an overpayment for an Allowable Expense (if the Plan pays more than the amount necessary), the Trustees have the right to recover the overpayment made on behalf of you, or your covered spouse or other covered dependents. This recovery may mean withholding future benefits. The Plan may collect any overpayments from one or more of the following, as determined by the Trustees:

■   Any persons to whom or for whom the overpayments were made;

■   Any insurance companies; and

■   Any other organizations.

## Provider Self-Audit Program

This Program is intended to encourage you and your dependents to review carefully the bills you receive from professional care providers. A cash refund is available for discovering and arranging the recovery of overcharges made on your bills. The cash refund is 25% of the actual amount of the overcharge that the provider agrees is invalid.

Overcharges of less than $25 are not eligible for refund under this Program. In addition, the maximum the Plan will pay you in a calendar year under this Program is $500.

You must negotiate directly with the provider, within 45 days of receipt of your bill. The Fund will not get involved. To be eligible for the cash refund, you must have met your calendar year Deductible.

## General Limitations and Exclusions

The following list summarizes important limitations on benefit payments from the Plan; for a complete list refer to the Plan Document. This list is in addition to any other limitations or exclusions listed throughout this booklet.

1.  Any Injury, Sickness, or dental treatment of an eligible person that arises out of or in the course of any occupation or employment for wage or profit (i.e., for which the individual has received or is eligible to receive any benefits under a workers' compensation or occupational disease law). However, if a case is disallowed by the Industrial Commission, benefits may be payable under the Plan.

2.  Any expense incurred after eligibility ends, except as specifically provided otherwise.

3.  Any expense in excess of the Allowable Charge. Such excess charge is the responsibility of the eligible person.

4.  Any expense or charge for services or supplies not recommended or approved by the attending physician or surgeon or not Medically Necessary in treating the Injury or Sickness.

5.  Any expense or charge for services or supplies that is subject to the exercise of the Trustees' discretion to reasonably interpret the terms of the Trust, Plan, or Summary Plan Description (SPD) and that is deemed a non-Covered Expense or service.

6.  Any expense or charge for a checkup, premarital exam, or routine physical exam for employment, except as specifically provided otherwise.

7.  Any expense or charge for custodial care, except as specifically provided otherwise for hospice care or skilled nursing care.

8.  Any loss, expense, or charge that results from cosmetic or reconstructive surgery except:

    a.  When such service is incidental to, or follows within two years of, surgery resulting from Injury, Sickness, or disease of the involved part while a Person is eligible under the Plan.

    b.  When surgery is performed because of a congenital disease or anomaly that resulted in a functional defect as determined by the attending physician.

    c.  For corrective surgery for conditions that prevent an organ of the body from performing and functioning properly.

    d.  For breast reconstructive surgery following a mastectomy.

9.  Any expense or charge in connection with dental work or surgery (including prescription drugs or vitamins for fluoride treatment), except as specifically provided otherwise.

10. Any expense or charge for failure to appear for an appointment as scheduled or for completion of claim forms.

11.    Any expense or charge that an eligible person does not have to pay.

12.    Any loss, expense, or charge resulting from a claimant's participation in a riot or during the commission of an assault or a felony, except Injuries or Sicknesses that are the result of acts of domestic violence.

13.    Any loss, expense, or charge that results from an act of declared or undeclared war or armed aggression.

14.    Any loss, expense, or charge incurred while an eligible person is on active duty or in training in the armed forces, national guard, or reserves of any state of any country.

15.    Any supply or equipment for personal hygiene, comfort, or convenience, except as specifically provided otherwise.

16.    Special home construction to accommodate a medical condition.

17.    Ambulance service, except as specifically provided otherwise.

18.    Any service or supply received from a hospital that does not meet the Plan's definition of a hospital.

19.    Any charge incurred for services or treatment rendered by a member of the eligible person's family.

20.    Any charge incurred for treatment of a Behavioral Health Disorder while confined in an institution operated by any government or government agency.

21.    Any charge incurred for education, training, or room and board while confined in an institution that is primarily an institution of learning or training.

22.    Any charge incurred for special education, regardless of the type of education, purpose of education, recommendation of the attending physician, or the qualifications of the individual rendering the special education, except for approved educational programs for treating diabetic and cardiac patients.

23.    Any expense or charge incurred by an eligible person confined in an institution that is primarily a place of rest, a place for the aged, or nursing home.

24.    Any expense or charge incurred for treatment or consultation by a psychologist or social worker, unless such treatment or consultation is specifically recommended by a referring medical physician or such treatment or consultation is under the direct supervision of a medical physician. A psychologist or social worker must possess a master's or higher degree.

25.    Any expense or charge incurred for treatment or consultation with a social worker, registered nurse, or certified addictions counselor, unless the professional has a master's degree in social work and the charge for such services are recommended by and/or under the supervision of a medical physician or psychiatrist.

If you have any concern about whether a particular expense is covered by the Plan, contact the Welfare Trust Fund Administrative Office at 800-765-4239.

# Claims and Appeals Procedures

Most providers will file medical and dental claims for you. You should encourage your provider to file claims as soon as possible. If you need to submit a health claim (such as for vision covered expenses), your claim must:

- Be written or electronically submitted in accordance with HIPAA's EDI standards (oral communication is acceptable only for urgent care claims);

- Be received by the Welfare Trust Fund Administrative Office or authorized agent;

- Name a specific eligible person;

- Name a specific medical condition or symptom;

- Provide a description and date of a specific treatment, service, or product for which approval or payment is requested (post-service claims must include an itemized detail of charges);

- Identify the provider's name, address, phone number, professional degree or license, and federal Tax Identification Number (TIN); and

- When another plan is the primary payer, include a copy of the other plan's Explanation of Benefits (EOB) statement along with the submitted claim.

In the event of your death, your beneficiary should file a claim for death benefits as soon as possible. Various forms that may be needed for processing your claim may be printed by going to the Fund's website (www.neca-ibew.org). All claims should be submitted to:

NECA-IBEW Welfare Trust Fund
2120 Hubbard Avenue
Decatur, IL 62526-2871
800-765-4239.

All requested information should be submitted with claims. The employee's full name, address, and BlueCross BlueShield unique ID number (or your Social Security Number if you do not have a unique ID number) should be included on all claims. Claims submitted one year after the date incurred will be denied. In addition, if a claim is filed within 12 months, but additional information is requested and not received within that 12-month period, the claim may be denied. When filing a claim, please wait at least four weeks from the date you had the service performed before you contact the Welfare Trust Fund Administrative Office. You may also check your claims through the website (on page 2).

## Death Benefit Claims

The Death Benefit is paid to your designated beneficiary or beneficiaries promptly upon submission of the appropriate application form provided by the Welfare Trust Fund

Administrative Office and upon receipt of a certified copy of the death certificate. Be sure to update your beneficiary information as you have changes in your life.

Generally, the Plan will make a decision on a Death Benefit claim and notify your beneficiary of the decision within 90 days of receiving the claim. If the Plan needs additional information to make a decision, your beneficiary will be notified as to what information must be submitted. Your beneficiary will have up to 45 days to submit the additional information. Once the Plan receives the information, your beneficiary will be notified of the Plan's decision on the claim within the 90-day period.

If circumstances require an extension of time for processing the claim, your beneficiary will be notified in writing that an extension is necessary. The notice will state the special circumstances and the date the Plan expects to make a decision. The extension will not be for more than 90 days from the end of the initial 90-day period.

## Accidental Death and Dismemberment Benefit Claims

The Accidental Death and Dismemberment Benefit is paid to you in the event of disability or to your designated beneficiary or beneficiaries in the event of your death. Benefits are paid promptly upon submission of the appropriate application form provided by the Welfare Trust Fund Administrative Office and upon receipt of a physician statement certifying disability or a certified copy of the death certification upon death.

The Plan will make a decision on an Accidental Death and Dismemberment Benefit claim and notify you or your beneficiary of the decision within 90 days of receiving the claim. If the Plan needs additional information to make a decision, you or your beneficiary will be notified as to what information must be submitted. You or your beneficiary will have up to 45 days to submit the additional information. Once the Plan receives the information, you or your beneficiary will be notified of the Plan's decision on the claim within the 90-day period.

If circumstances require an extension of time for processing the claim, you or your beneficiary will be notified in writing that an extension is necessary. The notice will state the special circumstances and the date the Plan expects to make a decision. The extension will not be for more than 90 days from the end of the initial 90-day period.

## Weekly Income Benefit Claims

Weekly Income Benefits are paid to you promptly upon submission of the appropriate application form provided by the Welfare Trust Fund Administrative Office and upon receipt of an *Attending Physician Statement.* Claims should be submitted to the Welfare Trust Fund Administrative Office as soon as possible after you become disabled. You must include an *Attending Physician Statement.* Proof of eligibility or continued disability may be required periodically for continuation of this benefit. If you are performing light-duty work, you are not eligible for Weekly Income Benefits.

The Plan will make a decision on a Weekly Income Benefit claim and notify you of the decision within 45 days of receiving the claim. If the Plan requires an extension of time, due to matters beyond the control of the Plan, the Plan will notify you of the reason for the delay and when the decision will be made. This notification will occur before the expiration of the original 45-day period. A decision will be made within 30 days of the time the Plan notifies you of the delay. If a determination is not made within the first 75 days, the Plan will notify you within that time if an additional 30 days is needed to make a decision on your claim. A decision will be made within the second 30-day extension of the decision period.

If the Plan needs additional information to make a decision, you will be notified as to what information must be submitted. You will have up to 45 days to submit the additional information. Once the Plan receives the information, you will be notified of the Plan's decision on the claim within 30 days of the Plan's receipt of the information.

## Health Care Benefit Claims

All network and non-network providers should file medical claims with their local BlueCross BlueShield (BCBS) office. Network claims qualifying for benefits will be paid by BCBS. Non-network claims will be paid to the provider. No "up front" payments should be made to network providers. You should wait until the claim has been processed by the Fund before making payment due to the fact that discounts and other factors may affect your balance due.

If a non-network provider refuses to file a claim with BCBS and/or insists you make either a partial or a full payment for services provided, you may be reimbursed for covered charges by sending an itemized bill and proof of payment to the Welfare Trust Fund Administrative Office.

You may periodically be required to complete an enrollment card, as requested. If you do not complete and return the card when requested, claims will not be paid until the card is returned. In addition, you and your dependents are required to complete and return an Accident Form for each accident before benefits will be paid relating to that accident.

### Pre-Service Claims under the Pre-Admission Review Process

You are required to obtain pre-certification for transplant surgery and bariatric surgery. When pre-certification is required, the claim is considered a pre-service claim. The Plan will make a decision on your pre-service claim and notify you of the decision within a reasonable period appropriate to the medical circumstances, but no later than 15 days after receiving your pre-service claim. If the Plan requires an extension of time, due to matters beyond the control of the Plan, the Plan will notify you of the reason for the delay and when the decision will be made. This notification will occur before the expiration of the original 15-day period. A decision will be made within 15 days of the time the Plan notifies you of the delay.

If the Plan needs additional information from you to make its decision, you will be notified as to what information must be submitted. You will have up to 45 days to submit the additional information. Once the Plan receives the information from you, you will be notified of the Plan's decision on the claim within 15 days.

If your doctor recommends transplant surgery or bariatric surgery, you must call the Welfare Trust Fund Administrative Office at 217-875-2947 or 217-875-3017 before admission. You are encouraged to utilize a Centers of Excellence (COE) facility for transplant surgery. In addition to saving you money, COE facility doctors specialize in transplant surgeries and often surgeries performed at a COE facility have a higher success rate than those performed at a non-COE facility.

### Urgent Care Claims

Urgent care claims are claims for medical care or treatment that would:

- Seriously jeopardize your life or health, as determined by a physician, if normal pre-service standards were applied; or

- Subject you to severe pain that cannot be adequately managed without the care or treatment for which approval is sought, in the opinion of a physician with knowledge of your condition.

If your claim involves urgent care, the Plan will make a decision on your urgent care claim and notify you of the decision as soon as possible, taking into account your medical needs, but no later than 72 hours after the Plan receives your claim.

If you do not provide sufficient information to determine whether or to what extent benefits are covered or payable for urgent care, the Fund Administrator or its designee will notify you as soon as possible, but no later than 24 hours after receipt of the claim, of the specific information necessary to process the claim. You must provide the specified information within 48 hours. If you do not provide the information, your claim will be denied.

### Post-Service Claims

Claims you submit after you have received the services, are considered post-service claims (this includes medical, dental, and vision claims). The Plan will make a decision

on your post-service claim and notify you of the decision within 30 days of receiving a post-service claim. If the Plan requires an extension of time due to matters beyond the control of the Plan, the Plan will notify you of the reason for the delay and when the decision will be made. This notification will occur before the expiration of the original 30-day period. A decision will be made within 15 days of the time the Plan notifies you of the delay.

If the Plan needs additional information from you to make a decision, you will be notified as to what information must be submitted. You will have up to 45 days to submit the additional information. Once the Plan receives the information from you, you will be notified of the Plan's decision on the claim within 15 days.

## Prescription Drug Benefit Claims

When you go to a participating pharmacy, Prescription Drug Benefits are obtained by showing the pharmacist your prescription drug ID card and paying the applicable Copayment. You must meet your prescription drug calendar year Deductible before the Plan begins to pay Prescription Drug Benefits. If you go to a pharmacy that does not participate in the pharmacy network, you must file a claim. Claims for Prescription Drug Benefits obtained at a non-participating pharmacy should be submitted to the Welfare Trust Fund Administrative Office and will be reimbursed at 50%, provided the prescription is a Covered Expense under the Plan.

Information regarding the Mail-Order Prescription Drug Program is available from the Welfare Trust Fund Administrative Office.

## Health Reimbursement Account (HRA) Claims

You must submit a claim for reimbursement of any eligible expenses, as described on page 59. A request for reimbursement of an eligible expense is considered a claim. Claim decisions are subject to the Plan's claims procedures for post-service claims listed in this section.

## If Your Claim is Denied

If your claim is denied, in whole or in part, you (or your beneficiary) will receive notice of the denial of your claim within the appropriate period (as previously described) that provides the following information:

- The specific reason or reasons your claim was denied;

- Reference to the specific Plan provision(s) on which the denial was based;

- If an internal rule, protocol, or guideline was relied on in making the denial, a copy of the rule, protocol or guideline (or a statement that it is available upon request at no charge);

- If the determination was based on Medical Necessity, Experimental/Investigational exclusion, or similar exclusion, an explanation of the scientific or clinical judgment for the determination applying the terms to your claim (or a statement that it is available upon request at no charge);

- A description of any additional information you need to submit to support your claim;
- An explanation of why the additional information is needed;
- An explanation of the Plan's appeal procedures and applicable time limits; and
- A statement of your right to bring a civil action under ERISA following an adverse benefit determination on appeal.

If you do not receive the notice within the appropriate periods (as previously described) and there has been no settlement on your claim, you should write to the Welfare Trust Fund Administrative Office for information.

## Appealing the Denial of Your Claim

If your claim is denied, you are entitled to a full and fair review of your claim, known as an appeal. You or your authorized representative must submit your written appeal within 180 days of the denial of your claim (60 days for a claim for death and/or accidental death and dismemberment benefits). If your claim involves urgent care, you may make your request for review orally.

In making your appeal, you or your authorized representative will be entitled to submit additional proof that you are entitled to benefits and examine any document related to your claim that is in the possession of the Welfare Trust Fund Administrative Office.

For purposes of the claim and appeal procedures, a claim denial (adverse benefit determination) includes:

- A denial, reduction, or termination of, or a failure to provide or make payment in whole or in part for a benefit or your eligibility to participate in this Plan or a determination that a benefit is not a covered benefit;

- A benefit reduction resulting from the application of any pre-certification or Utilization Review decision, pre-existing condition exclusion, source-of-injury exclusion, network exclusion, other limitation on an otherwise covered benefit or failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not Medically Necessary or appropriate;

- The Plan's payment of less than the total amount of expenses submitted with regard to a claim, even where the Plan is paying the portion of the claim that is covered under the terms of the Plan; or

- A rescission of coverage, whether or not there is an adverse effect on any particular benefit at that time.

Generally, a decision on your appeal will be made as soon as possible and no later than:

- *45 days* of receiving your written appeal for Weekly Income Benefit claims (however, if special circumstances require an extension of time, up to 45 days, a decision will be made within 90 days after the date the Plan receives the request for review);

- ***30 days*** of receiving your written appeal for pre-service health care claims;

- ***72 hours*** for urgent care health care claims; or

- ***As provided under the Quarterly Meeting Rule:*** Death, Accidental Death and Dismemberment and post-service health care claims will be reviewed at the next regularly scheduled Claim Appeal Committee meeting. Meetings are held quarterly. If the Trustees receive the request for review of such claim within 30 days of the next regularly scheduled Claim Appeal Committee meeting, the request for review may be considered at the second regularly scheduled Claim Appeal Committee meeting. If special circumstances require a further extension of time for processing, a benefit determination will be rendered not later than the third regularly scheduled board meeting. You (or your beneficiary) will be advised in writing in advance if this extension will be necessary. Once a decision on review of the claim is reached, you (or your beneficiary) will be notified of the decision as soon as possible, but no later than five days after the decision has been reached.

The written notice of the decision on review will include:

- The specific reason or reasons the appeal was denied;

- A reference to the specific Plan provisions on which the denial was based;

- A statement that you (or your beneficiary) are entitled to receive reasonable access to and copies of all documents relevant to the claim upon request and free of charge;

- A statement of your right to bring a civil action under ERISA following an adverse benefit determination on review; and

- A statement about alternative ways to appeal the decision and referral to the Department of Labor or your state's regulatory agency.

The Trustees have broad discretionary authority to determine all benefit claim appeals and to interpret the Plan. The Trustees' decision on appeal will be given judicial deference in any later court action or administrative proceeding. You must follow and exhaust the Plan's claims and appeals procedures before you are permitted to bring any court action against the Plan.

You may appear before the Claim Appeal Committee, or may designate someone else to represent you at such a hearing. If you designate someone as your representative at the meeting, the Fund will require a written authorization. If you decide to make a personal appearance or have someone do so on your behalf, it must be done at your own expense. The Trustees reserve the right to hold any meeting to consider appeals by telephonic conference call. Your right "to appear before" the Trustees considering the appeal in this instance is limited to participating in the telephone conference at the time the appeal is presented.

## Authorized Representative

You must provide written authorization for a representative to act on your behalf to file a

claim under this Plan. Authorization forms will be provided with the appeal form. The following individuals may be recognized as your authorized representative:

- Health care provider;
- Legal spouse;
- Dependent child age 18 or over;
- Parents or adult siblings;
- Grandparent;
- Court ordered representative, such as an individual with power of attorney for health care purposes or legal guardian or conservator; or
- Other adult.

No appointment of an authorized representative or assignment of benefits to another person or entity provides the representative with any right to maintain an action in contract, tort, or as an ERISA benefit claim against the Fund or the Trustees for recovery of any amounts from the Plan. Any claim brought against the Plan for payment of benefits must be brought in the name of the eligible person upon whom services were performed.

Once you name an authorized representative, the Plan will route all future claims and appeals-related correspondence to your authorized representative and not to you. The Plan will honor the designated authorized representative for one year, or as mandated by a court order, before requiring a new authorization. However, you may revoke a designated authorized representative at any time by submitting a signed statement.

The Plan reserves the right to withhold information from a person who claims to be an authorized representative if there is suspicion about the qualifications of the individual claiming to be the authorized representative.

# Important Information about the NECA-IBEW Welfare Trust Fund

The NECA-IBEW Welfare Trust Fund was established to provide health and welfare benefits to eligible participants who have had contributions made to the Fund on their behalf by participating employers. Participants in the Plan include eligible employees, eligible retirees, and their eligible dependents. There is a list of participating local unions on page 88. For a list of participating employers, please contact the Welfare Trust Fund Administrative Office.

The Trust Fund is operated under the direction of a Board of Trustees, some of whom are selected by the employers and some of whom are selected by participating local unions. The Trustees collect, manage, and distribute the Fund's accumulated assets, determine benefits, and establish eligibility rules.

This Summary Plan Description has been prepared in compliance with the Employee Retirement Income Security Act (ERISA) of 1974, as amended. It is intended to assist participants in understanding the benefits provided and the contract provisions governing the administration of the NECA-IBEW Welfare Trust Fund.

The following information is provided to help you identify this Plan and the people who are involved in its operations.

**Plan Name.** NECA-IBEW Welfare Trust Fund.

**Board of Trustees.** A Board of Trustees is responsible for the operation of this Plan. A complete list of members of the Board of Trustees is provided at the end of this booklet.

**Plan Sponsor and Plan Administrator.** The Plan is administered by a joint labor-management Board of Trustees. The Board is comprised of individuals appointed by the Chapters of the National Electrical Contractors Association, Inc. or other multi-employer groups representing participating employers in an area and representatives of participating local unions affiliated with the International Brotherhood of Electrical Workers that have become parties to the Fund Agreement and Declaration of Trust. The Board of Trustees is assisted in the administration of the Fund by an administrative manager.

**Plan Identification Numbers.** The Employer Identification Number (EIN) assigned by the Internal Revenue Service is 37-0738564. The number assigned to the Plan by the Plan Sponsor is 501.

**Service of Legal Process.** Steven L. Myers is the Plan's agent for the service of legal process. If legal disputes involving the Plan arise, legal documents should be served upon Steven L. Myers at the NECA-IBEW Welfare Trust Fund, 2120 Hubbard Avenue, Decatur, IL 62526-2871 or upon any individual Trustee at the same address.

**Source of Contributions.** The Fund receives contributions from employers pursuant to written agreements requiring contributions to the Fund on behalf of employees. The

contribution rate is set by the Trustees and contributions are paid monthly. Contributions are also received by the Fund from employees and retirees eligible to make self-payments.

**Plan Funding.** All Plan benefits are self-funded and administered directly by the Trust Fund, except for prescription drug benefits, which are administered by Express Scripts.

**Accumulation of Assets.** All assets comprising the funds of the Plan are held in trust by the Board of Trustees pending payment of benefits and administrative expenses.

**Plan Year.** The Fund is maintained on a 12-month fiscal year basis ending each June 30. The Plan year is different from the 12-month administrative period, which is the calendar year (January 1 – December 31).

**Plan Type.** This Plan provides death, dental, disability, disease management, health reimbursement account, medical, prescription drug, vision, and wellness benefits for active participants. It also provides death, disease management, health reimbursement account, medical, prescription drug, and wellness benefits for retirees.

**Plan Amendment.** The Welfare Trust Plan is summarized and detailed in this booklet. The Trustees have the right to amend or terminate the Plan at any time in whole or in part in accordance with the Trust Agreement. You will be notified, in writing, of any Plan amendments. In the event the Plan is terminated, any and all assets remaining after the payment of all obligations and expenses will be used in accordance with the purposes determined by the Trustees according to the Trust Agreement. However, any use of such assets will be made only for the benefit of the Plan participants who were covered under the Plan at the time of the Plan's termination.

**Benefits Are Not Vested.** You do not have a vested right to benefits under the Plan, and benefits may be amended or terminated at any time. Further, your participation in the Plan is not a guarantee of continuing employment.

**Plan Documents.** Copies of the Trust Agreement, Plan Document, and amendments to those documents are available for review by participants. Participants may arrange to review and obtain these documents at the Welfare Trust Fund Administrative Office or at the office of participating local unions. In addition, a complete set of these documents may be requested, in writing, from the Welfare Trust Fund Administrative Office. The Fund may charge a reasonable fee to cover the cost of reproducing documents. Requests for documents should be addressed to:

Plan Administrator
NECA-IBEW Welfare Trust Fund
2120 Hubbard Avenue
Decatur, IL 62526-2871
800-765-4239.

If any discrepancy exists between this booklet and the Plan Documents, the provisions of the Plan Documents will govern.

**NECA-IBEW Welfare Trust Fund's Privacy Policy.** A copy of the Fund's Privacy Policy is available for review by participants. Participants may arrange, by appointment, to review and obtain this document at the Welfare Trust Fund Administrative Office. A copy is also posted on the NECA-IBEW website (www.neca-ibew.org). In addition, a copy may be requested, in writing, from the Welfare Trust Fund Administrative Office. The Fund may charge a reasonable fee to cover the cost of reproducing this document. Requests for the Privacy Policy should be addressed to:

HIPAA Privacy Officer
NECA-IBEW Welfare Trust Fund
2120 Hubbard Avenue
Decatur, IL 62626-2871
800-765-4239.

## ERISA Rights

As a participant in the NECA-IBEW Welfare Trust Fund, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan participants are entitled to the following rights.

### *Receive Information about Your Plan and Benefits*

You have the right to:

- Examine, without charge, at the Welfare Trust Fund Administrative Office, 2120 Hubbard Avenue, Decatur, IL 62526-2871, and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts, collective bargaining agreements, and a copy of the latest annual report (Form 5500 series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration (EBSA);

- Obtain, upon written request to the Fund Administrator, copies of documents governing the operation of the Plan, including insurance contracts, collective bargaining agreements, and copies of the latest annual report (Form 5500 series) and updated Summary Plan Description (the Fund Administrator may make a reasonable charge for the copies); and

- Receive a summary of the Plan's annual financial report, which the Fund Administrator is required by law to provide to each participant.

### *Continue Group Health Plan Coverage*

You also have the right to:

- Continue health care coverage for yourself, spouse, or dependents if there is a loss of coverage under the Plan because of a qualifying event. You or your dependents may have to pay for such coverage, if it is elected (review this Summary Plan Description

and any documents governing the Plan on the rules governing your COBRA Continuation Coverage rights.); and

- Reduce or eliminate exclusionary periods of coverage for Pre-Existing Conditions under your group health plan, if you have creditable coverage from another plan. You should be provided a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when:
  - You lose coverage under the Plan;
  - You become entitled to elect COBRA Continuation Coverage; or
  - Your COBRA Continuation Coverage ends.

You may also request a certificate of creditable coverage before losing coverage or within 24 months after losing coverage. Without evidence of creditable coverage, you may be subject to a Pre-Existing Condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called fiduciaries of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

### Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of the Plan Documents or latest summary annual report from the Plan and do not receive it within 30 days, you may file suit in a federal court. In such a case, the court may require the Fund Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Fund Administrator.

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. However, you may not begin any legal action, including proceedings before administrative agencies, until you have followed and exhausted the Plan's claims and appeals procedures. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in federal court. If you believe that Plan fiduciaries have misused the Plan's money, or if you believe that you have been discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file

suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

### *Assistance with Your Questions*

If you have any questions about your Plan, you should contact the Fund Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Fund Administrator, you should contact the nearest office of the EBSA at:

*National Office:*
Division of Technical Assistance and Inquiries
Employee Benefits Security Administration
U.S. Department of Labor
200 Constitution Avenue N.W.
Washington, DC 20210
866-444-3272;

or

*Nearest Regional Office:*
Employee Benefits Security Administration
Chicago Regional Office
200 West Adams Street, Suite 1600
Chicago, IL 60606
312-353-0900.

or more information on your rights and responsibilities under ERISA or for a list of EBSA offices, visit the EBSA's website at www.dol.gov/ebsa.

> **Nothing in this booklet is meant to interpret, extend, or change in any way the provisions expressed in the Plan Document. The Board of Trustees reserves the right to amend, modify, or discontinue all or part of this Plan whenever, in their judgment, conditions so warrant. In addition, the Board of Trustees reserves the right to instigate, increase, and/or decrease self-payments.**

## Board of Trustees

| Union Trustees | Employer Trustees |
|---|---|
| Jim Bailey | Lloyd N. Allen, Sr. |
| Glenn Baugh | E. Wes Anderson |
| Larry Boswell | Wade Belcher |
| John Bzdawka | Jonathan R. Borden |
| Kevin Cope | David E. Bruce |
| Shad Etchason | Charles Crow |
| Jimmy Evans | William V. Fricke |
| Paul Flynn | Sam Galloway III |
| Jaye R. Fuller | Terry Gipson |
| Paul Green | Jon Huston |
| Charles C. Griffin, Jr. | Beth Iding |
| Charlie Hoss | Mark Kawolsky |
| Steve Hughart | Jeff Linkenhelt |
| David Karcher | Dave Mounts |
| Joe Kerr | Ronald Roberts |
| Ralph Mayes | Billy Serbousek |
| Jim Ogden | Brian Sullivan |
| Darrell Sade | Ted Uppole |
| Rich Veitengruber | Larry E. Van Tries |

You can contact the Board of Trustees care of the NECA-IBEW Welfare Trust Fund Administrative Office:

NECA-IBEW Welfare Trust Fund
2120 Hubbard Avenue
Decatur, IL 62526-2871
800-765-4239
www.neca-ibew.org.

# Participating Local Unions

- Local 16
- Local 34
- Local 146
- Local 193
- Local 197
- Local 305
- Local 349
- Local 494
- Local 531
- Local 538
- Local 558
- Local 601
- Local 668
- Local 702
- Local 725
- Local 816
- Local 855
- Local 873
- Local 1701

## AFFIDAVIT OF SERVICE

| Case:<br>CACE 18<br>001182 | Court:<br>In the County of the Seventeenth Judicial Circuit In<br>And For | County:<br>Broward , FL | Job:<br>1974010 (000079) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>K.B. Indi individual and on behalf of class of all other similar<br>situated | | **Defendant / Respondent:**<br>Neca-Ibew Walfare Trust Fund | |
| **Received by:**<br>Tactical Services | | **For:**<br>Global Process Services Corp | |
| **To be served upon:**<br>Neca-Ibew Walfare Trust Fund | | | |

I, Steven Pecharich, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Robin Hamilton, Corporate: 2120 Hubbard Ave, Decatur, IL 62526

**Manner of Service:** Authorized, Jan 26, 2018, 2:58 pm CST

**Documents:** Summons and Complaint

**Additional Comments:**
1) Successful Attempt: Jan 26, 2018, 2:58 pm CST at Corporate: 2120 Hubbard Ave, Decatur, IL 62526 received by Robin Hamilton. Age: 40; Ethnicity: Caucasian; Gender: Female; Weight: 150; Height: 5'7"; Hair: Blond; Relationship: Administrator Assistant;

Served

_____ 1/30/18
Steven Pecharich                           Date
115.002503

Tactical Services
1701 E. Empire St. Suite 360-306
Bloomington, IL 61704
309-662-0550

Subscribed and sworn to before me by the affiant who is
personally known to me.

_____ _____
Notary Public
1-30-18                                        5-9-18
Date                    Commission Expires

OFFICIAL SEAL
DEBRA L HUTSON-LOVE
Notary Public - State of Illinois
My Commission Expires May 9, 2018

# EXHIBIT B

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

Case No. CACE18001182

| | | |
|---|---|---|
| K.B., Individually and on Behalf of a | ) | REMOVED TO: United States District Court |
| Class of All Others Similarly Situated, | ) | Southern District of Florida, Fort Lauderdale |
| | ) | Division |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NECA-IBEW WELFARE TRUST FUND, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF FILING NOTICE OF REMOVAL**

To:   Clerk of Court                          Joshua H. Eggnatz, Esq.
      Broward County Circuit Court            Michael J. Pascucci, Esq.
      201 S.E. 6th St.                        Steven Saul, Esq.
      Fort Lauderdale, FL  33301              Eggnatz Pascucci
                                              5400 S. University Dr., Suite 417
                                              Davie, FL  33328

PLEASE TAKE NOTICE that a Notice of Removal from State Court of the above-captioned action from the Broward County Circuit Court to the United States District Court for the Southern District of Florida, Fort Lauderdale Division, was electronically filed on February 15, 2018, in the United States District Court, Southern District of Florida, Fort Lauderdale Division.  A copy of the Notice of Removal from State Court, with Exhibits, is attached as **Exhibit A**.  The Notice of Removal was filed with the concurrence of all Defendants in this matter.

PLEASE TAKE FURTHER NOTICE that pursuant to 28 U.S.C. §1446, this Court should not proceed further unless and until the case is remanded.

Respectfully Submitted,

 */s/ Ivelisse Berio LeBeau*
Ivelisse Berio LeBeau, Esq.
Florida Bar No. 0907693
Ivelisse@sugarmansusskind.com
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: (305) 592-2801
Facsimile: (305) 447-8115


 */s/ John P. Leahy*
*(pro hac vice admission pending)*
John P. Leahy, Esq., No. 6229680 (IL)
johnleahy@cavanagh-ohara.com
Cavanagh & O'Hara LLP
2319 W. Jefferson St.
Springfield, IL. 62702
(217) 544-1771 (tel.)
(217) 544-9894 (fax)

 */s/ James R. Kimmey*
*(pro hac vice admission pending)*
James R. Kimmey, No. 6314932 (IL)
jaykimmey@cavanagh-ohara.com
Cavanagh & O'Hara LLP
101 W. Vandalia St., Suite 245
Edwardsville, IL. 62025
(618) 692-5250 (tel.)
(618) 692-5254 (fax)

Attorneys for Defendant NECA-IBEW
Welfare Trust Fund

2

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing "Notice of Filing Notice of Removal" was electronically filed and served through the Florida Courts e-filing Portal on this 15th day of February, 2018 to:

> Joshua H. Eggnatz, Esq.
> Florida Bar No. 0067926
> JEggnatz@JusticeEarned.com
> Michael J. Pascucci, Esq.
> Florida Bar No. 83397
> MPascucci@JusticeEarned.com
> Steven Saul, Esq.
> Florida Bar No. 1002827
> SSaul@JusticeEarned.com
> Eggnatz Pascucci
> 5400 S. University Dr., Suite 417
> Davie, FL  33328

*/s/ Ivelisse Berio LeBeau*
Ivelisse Berio LeBeau, Esq.
Florida Bar No. 0907693
Ivelisse@sugarmansusskind.com
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
Telephone: (305) 592-2801
Facsimile: (305) 447-8115
